Danny M. BRIDGES, Plaintiff/Appellee,

v.

CSX TRANSPORTATION, INC., Defendant/Appellant.

Court of Appeals of Tennessee, Middle Section, at Nashville.

July 15, 1992.

Application for Permission to Appeal Denied by Supreme Court Dec. 7, 1992.

Phillip L. North, A. Gregory Ramos, North, Pursell & Ramos, Nashville, for plaintiff-appellee.

Gareth S. Aden, Todd J. Campbell, Gullett, Sanford, Robinson & Martin, Tyree B. Harris, III, Baker, Worthington, Crossley, Stansberry & Woolf, Nashville, for defendant-appellant.

## OPINION

LEWIS, Judge.

This is an appeal by defendant, CSX Transportation,[1] Inc., from a judgment entered by the court on the jury's verdict for plaintiff in the sum of $800,000.00. Plaintiff based his complaint on the Federal Employers Liability Act (hereafter FELA) and sought damages for injuries suffered while employed at CSX.

The pertinent facts are as follows:

The plaintiff began his employment with CSX in 1973 and worked continuously for CSX until he was injured in July 1988. He was first injured when he was a passenger in a Hoesch truck[2] on 21 July 1988. Plaintiff's job on the Hoesch truck was performed on an overtime basis and was in addition to his regular job as a carman with CSX. Plaintiff's Hoesch truck duties required him to be on call seven days a week, twenty-four hours a day.

Plaintiff's duties on the Hoesch truck involved using large hydraulic jacks, each weighing approximately 135 to 145 pounds. Plaintiff's use of the jacks required repetitive movement of the upper body.

On 21 July 1988, plaintiff was a passenger in the Hoesch truck traveling south on Interstate 65 to the site of a train derailment when one of the wheels on the Hoesch truck locked causing the truck to go out of control, cross the oncoming lanes of traffic, and overturn on the east side of the Interstate. In extricating himself from the Hoesch truck, plaintiff reached over-

---

1. The defendant will hereafter be referred to as defendant or CSX and plaintiff will hereafter be referred to as plaintiff or Mr. Bridges.

2. A Hoesch truck is a large ten-wheel vehicle used by CSX to assist in placing derailed freight cars back onto the railroad tracks.

head and held onto the steering wheel. As he was pulling himself up his feet slipped out from under him causing all of his weight to shift to his left arm and shoulder. Plaintiff testified that he immediately felt pain in his left shoulder area.

Following the accident plaintiff was taken back to CSX' Radnor Yard in Nashville where he received medical treatment from CSX' doctor. The doctor prescribed pain medication and advised plaintiff to remain on light duty for the next twenty-four hours. Plaintiff returned to work the next day but was able to perform only nonstrenuous jobs. Plaintiff did not work the following week due to a previously scheduled vacation.

On 1 August 1988, the first day plaintiff worked following his vacation, plaintiff went to see the CSX' company nurse, Brenda Steranka. Plaintiff advised Ms. Steranka that his left shoulder was still hurting and stated that he needed to see a doctor.

In the following weeks, plaintiff continued to go to Ms. Steranka and according to his testimony requested her to schedule a doctor's appointment. He testified at trial that he went to Ms. Steranka on possibly as many as ten occasions and asked her for a referral to a doctor for the purpose of treating his shoulder injury. Ms. Steranka did not dispute the fact that plaintiff came to her office approximately ten times complaining of shoulder pain. After plaintiff's repeated requests, Ms. Steranka agreed to make a doctor's appointment for plaintiff. Plaintiff testified that he later asked Ms. Steranka whether she had made the doctor's appointment and she told him that she had forgotten to do so.

On 13 October 1988, plaintiff was again injured while using a ten-foot aluminum ladder to repair bulkheads inside a boxcar at CSX' Radnor Yard facility in Nashville. The job of repairing the bulkheads inside the boxcar required the plaintiff, with the assistance of a fellow worker, to disconnect trollies from the various bulkheads and carry them to the ground. The trollies weighed approximately 180 to 200 pounds each.

Plaintiff was using an aluminum ten-foot ladder provided by CSX. Plaintiff alleged and testified that the ladder was not properly equipped with safety shoes, i.e., rubber skid pads located on the bottom of the four legs of the ladder. Plaintiff testified that he brought this to the attention of his supervisor, Mr. Wes Brown. Plaintiff asked Mr. Brown for permission to use a hydraulic lift in repairing the cars. Plaintiff further testified that Mr. Brown told him that the hydraulic lift was not available and that he would have to use the ladder in the condition it was in. Mr. Brown admitted at trial that the condition of the ladder violated standards promulgated by the Occupational Safety and Health Standards for General Industries. It was also acknowledged that the condition of the ladder violated CSX' own safety regulations.

Plaintiff nevertheless used the ladder as he had been instructed to do. As he began descending the ladder, it started shaking and wobbling. In order to keep from falling, plaintiff grabbed onto the bulkhead with his left arm causing all of his weight to be placed on his left shoulder, thereby aggravating his left shoulder injury.

Plaintiff testified that he made numerous requests to CSX to be sent to a doctor for treatment and when no one at CSX acted upon his requests, plaintiff determined that because of his pain he would schedule an appointment on his own. On 21 October 1988, plaintiff saw Dr. Alan Henson, an orthopedic surgeon in Madison, Tennessee. Dr. Henson ordered an arthrogram in order to determine the extent of plaintiff's injury. The arthrogram revealed that plaintiff had a large tear in his rotator cuff. It was Dr. Henson's opinion when he saw plaintiff on 21 October 1988 that the rotator cuff tear had occurred at least two and a half months earlier which would date the original tear to the time of plaintiff's first accident on 21 July 1988. Dr. Henson testified that if he had had the opportunity to see and examine the plaintiff within a month of the 21 July 1988 accident, he would have immediately imposed physical restrictions on plaintiff's work activities.

Dr. Henson performed shoulder surgery on plaintiff on 2 November 1988 and thereafter plaintiff wore a shoulder immobilizer for thirty days. He subsequently began a regimen of vigorous physical therapy, and in February 1989 Dr. Henson allowed plaintiff to return to light duty work under a twenty-pound restriction. Plaintiff was notified by Dr. Joseph Thomasino, Chief Medical Officer at CSX, that the railroad had no light duty work available for him.

Plaintiff then enrolled in an intensive work-hardening program. At the end of this program, Dr. Henson advised plaintiff that he could return to work under the original physical restrictions. Plaintiff returned to work at CSX on 8 May 1989. While plaintiff tried to return to his overtime duties on the Hoesch truck, the strenuous nature of these duties proved to be too demanding. Accordingly, Dr. Henson restricted plaintiff to his regular duty work week of ten hours a day, four days a week. Dr. Henson later modified this restriction to make it clear that plaintiff was restricted to a forty hour work week and was not to engage in any overtime duty. Dr. Henson testified that plaintiff retained a twenty (20%) percent permanent partial impairment to his left upper extremity which translated to a twelve (12%) percent permanent partial impairment to the body as a whole. Dr. Henson also testified that plaintiff should refrain on a permanent basis from doing any overtime work in his employment at the railroad. Plaintiff had made $16,166.77 overtime earnings in 1987 and, in the first ten months of 1988 had made $14,543.32 in overtime earnings.

Dr. Nicholas Sieveking, a vocational disability expert, testified that eighty-five percent of the jobs in the open market which the plaintiff could once perform are no longer available to him due to his injury and physical restrictions. Of the remaining fifteen percent of the jobs still available to plaintiff, Dr. Sieveking testified he could only expect to be paid an average of $8.01 per hour. Dr. John Moore, an economist, relying on Dr. Sieveking's testimony, testified regarding the economic impact of plaintiff's injuries. Dr. Moore testified that the plaintiff's loss of income and loss of earning capacity resulting from his injuries and restrictions amounted to $831,637.00. This did not include any damages for pain and suffering, loss of enjoyment of life, disfigurement, mental anguish, all of which are recoverable under the FELA.

The jury returned a verdict in favor of the plaintiff for $800,000.00. The trial court also granted plaintiff $10,317.72 in discretionary costs, and this appeal followed.

CSX' first issue is: "It was error for the trial court to admit the testimony of three of plaintiff's co-workers concerning hiding injured employees, hiding defective equipment and discouraging the reporting of accidents because the testimony was irrelevant and unfairly prejudicial."

Defendant argues that former CSX employee Kenneth Wheeler was allowed to testify regarding how one of the supervisors hid defective tow-motors from safety auditors, that a defective overhead crane had been used in the Diesel Shop, and that Lonnie Rinehart, Project Shop supervisor, had told the company nurse not to let him fill out a PF–1 accident report and that Rinehart went into a "rage" when he did fill out the PF–1 form. Wheeler also testified that Rinehart offered to pay him to report to work so as not to have a reportable injury, and that when an employee named Stephens fell at the Diesel Shop, Wheeler was "chewed out" for taking him to the hospital.

Defendant argues that none of this testimony was relevant since plaintiff's actions had nothing to do with tow-motors and overhead cranes and that plaintiff had been working in the New Shop under supervisor Tom Norris and not in the Diesel Shop or Project Shop under Mr. Rinehart. Defendant also argues that plaintiff had never filled out a PF–1 form or any other accident report and that there was no testimony that any supervisor said anything to plaintiff about filling out or not filling out an accident report. CSX also argues that there was no proof that any supervisor ever got upset with plaintiff for seeing a doctor or missing work and that there was

no evidence that plaintiff was ever offered pay just to report to work while he was injured. Additionally, defendant maintains that plaintiff had not testified that he was pressured in either one of his accidents.

Defendant also argues that it was error to allow Dennis Olster to testify that he had suffered a ruptured disc in February 1988 while working for CSX and that CSX lost his accident report; that the supervisors pressured the employees not to get hurt; that employees were paid while injured and that railroad claim agents threatened that if an employee got an attorney, benefits would be cut off. Defendant insists, and we agree, that there was no testimony by anyone, including plaintiff, that anyone ever threatened to cut off plaintiff's benefits or said anything about plaintiff getting an attorney. The evidence shows that after employing an attorney, plaintiff continued in CSX's employment. Defendant also argues there was no evidence that anyone lost plaintiff's accident report "because he never filled one out" and that plaintiff did not claim to have been offered pay to not report his accident.

Defendant also insists it was error to allow Gerald Gray, the General Chairman of the Brotherhood of Railroad Carmen, to testify over objection that a CSX official had threatened to close the Raceland, Kentucky shops if injuries kept occurring and that CSX in fact did close one shift and then later let the men return to work. CSX insists this testimony was not relevant since plaintiff had never worked at the Raceland Shops in Kentucky and the officials who allegedly took the action of laying off one shift was unrelated to any allegations in the instant suit.

Plaintiff correctly contends that the FELA makes a common carrier engaged in interstate commerce "liable in damages to any person suffering injury while he is employed by such carrier in such commerce ... resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier...." 45 U.S.C.A., § 51. Plaintiff further contends that under the FELA, "the railroad will be liable if its or its agents' negligence played

any part, even the slightest, in producing the employee's injury." *Richardson v. Missouri Pacific Railroad Co.,* 677 F.2d 663, 665 (8th Cir.1982).

We agree with the plaintiff that Congress intended the FELA to be a broad remedial statute and that courts have adopted a standard of liberal construction to facilitate these objectives. *Urie v. Thompson,* 337 U.S. 163, 180–81, 69 S.Ct. 1018, 1030, 93 L.Ed. 1282 (1949).

> The law [FELA] was enacted because the Congress was dissatisfied with the common-law duty of the master to his servant. The statute supplants that duty with the far more drastic duty of paying damages for injury or death at work due in whole or in part to the employer's negligence. The employer is stripped of his common-law defenses and for practical purposes the inquiry in these cases today rarely presents more than the single question whether negligence of the employer played any part, however small, in the injury or death which is the subject of the suit. The burden of the employee is met, and the obligation of the employer to pay damages arises, when there is proof, even though entirely circumstantial, from which the jury may with reason make that inference.

*Rogers v. Missouri Pacific Railroad,* 352 U.S. 500, 507–08, 77 S.Ct. 443, 449, 1 L.Ed.2d 493 (1957).

However, there must be some relevance between evidence offered and the issues for trial. Simply because evidence may bolster a plaintiff's case does not make it relevant.

■ " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Given v. Low,* 661 S.W.2d 687, 689 (Tenn.App.1983). Evidence upon a fact not in issue is irrelevant and not admissible unless collaterally admissible. *John P. Saad & Sons, Inc. v. Nashville Thermal Transfer Corp.,* 642 S.W.2d 151, 152 (Tenn.App.1982).

We are unable to find any relevancy between the evidence offered through the witnesses Wheeler, Olster and Gray and the issues presented by the plaintiff at trial. The evidence offered through these three witnesses was highly prejudicial to the defendant without any relevance to the issues.

Plaintiff argues two rationales for the admission of the evidence through these witnesses: 1) that defendant deserved this evidence for failure to admit liability, and 2) that the evidence was admissible as evidence of custom and habit. First, we know of no rule of law, and have been cited to none, that evidence is admissible simply because defendant will not admit liability.

Rule 406, Tennessee Rules of Evidence, regarding the admissibility of evidence of habit or routine practices is as follows:

(a) Evidence of the habit of a person, an animal, or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eye-witnesses, is relevant to prove that the conduct of the person, animal, or organization on a particular occasion was in conformity with the habit or routine practice.

(b) A habit is a regular response to a repeated specific situation. A routine practice is a regular course of conduct of an organization.

"However, the courts recognize the danger of such evidence, [regarding custom or habit] and do not look on it with favor; and, to be admissible, its relevancy and probative value must clearly appear." *Middle Tennessee Electric Membership Corp. v. Barrett*, 56 Tenn.App. 660, 669, 410 S.W.2d 914, 918 (1966) (quoting 31A C.J.S. *Evidence* § 180, p. 458).

The key element of proof of either habit or routine practice is regularity. The habit or practice must have been repeated sufficiently and frequently to have become routine. Accordingly, an act done a few times should not be viewed as a habit or routine practice. Greater regularity is required. Many courts use the phrase "semi-automatic" to describe the kind of conduct arising to the level of habit.

Cohen, *Tennessee Law of Evidence*, § 406.5 at 158 (2 ed. 1990).

In *C.F.W. Construction Company, Inc. v. Travelers Insurance Co.*, 363 F.2d 557, 560 (6th Cir.1966), the Sixth Circuit stated: "Habit or custom will not have probative value unless it is of sufficient regularity to make it probable that it would be carried out in every instance or in most instances."

It stretches one's imagination to show Kenneth Wheeler's testimony regarding a defective overhead crane in the Diesel Shop is akin to the ladder accident plaintiff had in the New Shop. We are also of the opinion that it does not show custom or habit regarding what one project shop supervisor's reaction was in a case about the witness Wheeler's trip to the doctor and how it reflects on another supervisor's reaction in another case, especially when there is no allegation that the supervisor got angry or threatening in any fashion with plaintiff.

Plaintiff admits that he was sent to a doctor by his supervisor on the day of the Hoesch truck accident. The testimony of the witness Olster that the claims department threatens to cut off benefits to injured employees who obtain attorneys does not prove custom or habit by itself. Mr. Gray's recount of what happened because of injuries in Raceland, Kentucky does not prove that anything happened to plaintiff in Nashville. The testimony regarding a lost accident report does not prove a "custom or habit" of losing employees' accident reports, especially when no one testified it happened to plaintiff and plaintiff never even turned in an accident report. There is no materiality due to the failure to turn in an accident report or the loss of an accident report when CSX could not deny its immediate knowledge of both of the accidents which plaintiff had.

A review of the evidence in the instant case shows that it does not provide reliable proof of custom or habit and further shows that the supposed custom or habit is irrelevant to the instant case. Even if the evidence is true, it does not bear upon any

controverted issue, nor does it elucidate any actions by any supervisor. It is not proof that would reflect on the claim that Nurse Steranka failed to make a doctor's appointment for plaintiff after allegedly promising to do so. None of the evidence offered reflects in any way upon the custom or habit of Ms. Steranka in not sending employees to the doctor. We are unable to find any probative value in this testimony and, even if there was value, the value is clearly outweighed by the prejudicial suggestion of this general bag of sins.

Tennessee Rule of Evidence 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Tenn.R.Evid. 403.

The Committee's notes explain that "unfair prejudice" means an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Evidence that appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action may cause a jury to base its decision on something other than the established propositions in the case. 1 J. Weinstein and M. Berger, *Weinstein's Evidence* § 403[03] at 403–29 to 403–39 (1990).

> Not all logically relevant evidence is admissible. Thus evidence which would advance the inquiry but would also inflame or unduly distract the jury or require an undeserved expenditure of judicial time or unfairly surprise the opponent may not be admissible. The probative weight of evidence must be balanced against these attendant costs in determining whether the evidence should be admitted.

*McCormack v. Riley,* 576 S.W.2d 358, 360 (Tenn.App.1978) (citation omitted).

We are of the opinion after a review of this record that the prejudicial effect of this testimony outweighed any probative value it might have had. It was an abuse of discretion for the trial court to admit the testimony. This issue is sustained.

Defendant's second issue is: "It was error for the trial court to deny defendant's motion for a mistrial or continuance at the close of the surprise testimony of the three co-workers because the testimony was both inadmissible and defendant did not have a fair opportunity to defend against it absent a mistrial or continuance."

For the reasons set out under the first issue, we are of the opinion that this issue should be sustained.

▬▬ Defendant's third issue is:

It was error for the trial court to exclude the testimony of supervisor Lonnie Rinehart based on defendant's answers to interrogatories because: (A) the interrogatories did not apply and plaintiff received actual written notice that the witness would be called to testify pursuant to a local rule; and (B) it denied defendant the ability to rebut the testimony erroneously admitted into evidence against this employee of defendant.

Defendant attempted to call Lonnie Rinehart, a supervisor, as a witness. Defendant's counsel informed the court that he was calling Mr. Rinehart not only in its case in chief but also as a rebuttal witness to respond to allegations made against Mr. Rinehart by plaintiff's witnesses. The trial court excluded Mr. Rinehart as a witness, for any purpose. Defendant tendered Mr. Rinehart's testimony by an offer of proof.

The plaintiff objected to the testimony of Mr. Rinehart because of the following interrogatory and answer:

7. Identify by name and address all witnesses to the accident or individuals who have knowledge regarding any other event or condition relevant to this case.

ANSWER: At this time, the defendant knows of no witnesses to the accident other than the occupants of the railroad vehicle listed above. The accident was investigated by State Trooper Anson B. Yeager. At this time, the defendant does not know of any other witnesses to the accident.

When Mr. Rinehart was offered as a witness, plaintiff's counsel argued that while Mr. Rinehart was not a witness to either of plaintiff's accidents and was not plaintiff's supervisor at the time of the accidents, Mr. Rinehart did have knowledge of the "condition" of plaintiff after the accident because Bridges had later come to work in Mr. Rinehart's shop and therefore Mr. Rinehart should have been included in the answer.

Plaintiff, so far as the record shows, did not claim to be surprised by the calling of Mr. Rinehart. Also, Mr. Rinehart was listed pursuant to Local Rule 22, Pre-trial Witnesses, the notice which defendant had timely provided to plaintiff.

The record shows that Mr. Rinehart would have testified that he was the general foreman of the Project Shop and that plaintiff first began working for him in May of 1989 after plaintiff's accidents, surgery and therapy. Mr. Rinehart would have testified that plaintiff drove the forklift and had been satisfactorily performing his duties for the past two years. He would have further testified that there were positions in the Project Shop, "write-up type jobs where they do inspection and the billing" and "recorder" which plaintiff could qualify for with training and earn overtime pay. These jobs entail little or no physical effort.

Mr. Rinehart's testimony would have shown that plaintiff was doing well at his work, that he was not in disfavor or at risk of losing his job. Mr. Rinehart's testimony also shows that with training plaintiff could earn overtime pay without endangering his shoulder in any way and that these overtime jobs are open to him in the Shop in which he works and "he would get the job for the asking."

We are of the opinion that it was error for the trial court to exclude this proof. We are of the opinion that the interrogatory propounded by plaintiff is not most reasonably interpreted to require the disclosure of witnesses as to plaintiff's job performance and job opportunities.

Further, the plaintiff demonstrated no prejudice by defendant's calling of this witness. Mr. Rinehart had been plaintiff's supervisor for two years and further, the defendant gave proper notice under Local Rule 22 and disclosed the witness to plaintiff seventy-two hours in advance of trial.

We are of the opinion that even if it was not error to exclude Mr. Rinehart's testimony in chief, it was error to exclude his testimony as rebuttal. Kenneth Wheeler, called by plaintiff as a witness, testified that Mr. Rinehart raged and attempted to intimidate him into not filing an accident report form. Mr. Rinehart would have rebutted this. Mr. Wheeler testified that Mr. Rinehart got angry when Wheeler did not return to work after seeing a doctor and then Rinehart offered to pay Wheeler for reporting to work even though he was injured. Mr. Rinehart would have denied those charges and would have explained why Wheeler was disgruntled with CSX. Wheeler testified about the unrelated injury to another employee, "Puppy Dog Stephens." Rinehart would have explained that this employee and supervisor Gunskey had not even worked for defendant since Rinehart came to Nashville in 1987.

Plaintiff also called a vocational psychologist to testify that plaintiff did not have the intelligence to function at a job calling for written comprehension. Plaintiff denied that in his work he had used a parts manual. If Mr. Rinehart had been allowed to testify, he would have not only testified that plaintiff had used the manual but also that he had "grasped it as well as anyone and used them on his own now."

Mr. Rinehart would have also rebutted the testimony of plaintiff's witness, Doug Collier, who testified that Rinehart had discouraged him from seeking a doctor's care and that Rinehart had tried to stop him from reporting his own accident. Mr. Rinehart would have testified that Mr. Collier told him he thought he had pulled a neck muscle and that he, Mr. Rinehart, took him to see the nurse. After treatment, Mr. Rinehart testified that he asked Collier if he wanted to see a doctor and that it was Collier who declined because he stated he was feeling better. Mr. Rinehart would have also testified that he followed up with Mr. Collier and helped him fill out his acci-

dent report; that when Mr. Collier mentioned it later, he was not able to say what caused the pain and Mr. Collier declined even to go back to a nurse.

Regarding Mr. Collier's testimony that he was now seeing a chiropractor and paying for it himself so as not to make a reportable injury, Mr. Rinehart would have testified that Mr. Collier had been seeing a chiropractor "routinely anyway." The chiropractor visits were not something "brand new" to Mr. Collier.

Rinehart's testimony that there were non-physical overtime jobs open to the plaintiff in the Project Shop was never heard by the jury. The jurors only heard plaintiff's witnesses stating that plaintiff had lost all overtime opportunities. Following plaintiff counsel's objections to Mr. Rinehart testifying, defense counsel noted that the men plaintiff had called the day prior had testified about Rinehart and that "I want an opportunity to rebut what they said about that particular gentleman."

The trial court did not allow Mr. Rinehart to testify in rebuttal or direct. We are of the opinion that this was error. *Airline Construction, Inc. v. Barr,* 807 S.W.2d 247, 263 (Tenn.App.1990).

We are of the opinion that the failure to allow Mr. Rinehart to testify in rebuttal was highly prejudicial to the defendant. This issue is sustained.

We have considered each of the other issues raised by the defendant and find them to be without merit and, because of our holding on the foregoing issues, we are of the opinion they need not be discussed further.

For the reasons set out herein, the judgment of the trial court is reversed and the cause remanded to the trial court for a new trial as to both the issue of liability and amount of damages.

Costs of the appeal are assessed to the plaintiff-appellee.

TODD, P.J., and CANTRELL, J., concur.