# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### APRIL, 1997 SESSION

**FILED**

May 22, 1998

**Cecil W. Crowson**
**Appellate Court Clerk**

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | No. 01C01-9605-CC-00208 |
| Appellee, | ) | |
| | ) | Rutherford County |
| vs. | ) | |
| | ) | Honorable J. S. Daniel, Judge |
| **JAMES CLAYTON YOUNG, JR.,** | ) | |
| | ) | |
| | ) | (Felony murder) |
| Appellant. | ) | |


FOR THE APPELLANT:

R. STEVEN WALDRON
TERRY A. FANN
202 West Main St.
Murfreesboro, TN 37130

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General & Reporter

DARYL J. BRAND
Assistant Attorney General
Criminal Justice Division
450 James Robertson Parkway
Nashville, TN 37243-0493

WILLIAM C. WHITESELL, JR.
District Attorney General
303 Rutherford County Judicial Bldg.
Murfreesboro, TN 37130


OPINION FILED: _____


**REVERSED AND REMANDED**


GARY R. WADE, JUDGE

## OPINION

The defendant, James Clayton Young, was convicted of felony murder, a Class A felony. The trial court imposed a life sentence. The grand jury had returned a three-count indictment that included charges of deliberate and premeditated murder, felony murder in the perpetration of a rape or an attempted rape, and unlawful disposal of a corpse. The defendant pled guilty to the unlawful disposal of a corpse and received a one-year sentence to be served concurrently with the life sentence for felony murder. Neither that conviction nor the sentence is at issue in this appeal. The trial judge granted the defendant's motion for judgment of acquittal on the first degree murder charge and had instructed the jury on second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide.

In this appeal of right, the defendant raises numerous issues. For the purposes of this appeal we have grouped related issues into the following categories:

1.   Sufficiency of the evidence. (Trial issues 19, 20, 21, 22)

2.   Denial of defendant's Motion to Suppress and use of audio-tape at trial. (Pre-trial issue 1, Trial issues 1 and 18)

3.   Expert testimony. (Trial issues 8, 9, 10, 11, 12, 13, 14, 15)

4.   Lay witness testimony. (Trial issues 2, 5)

5.   Admission of photographs and video tapes. (Pre-trial issues 2 and 3; Trial issue 6)

6.   Testimony of Jad Starnes. (Trial issues 3 and 7)

7.   Trial court's comments. (Trial issue 4)

8.   A defendant's right to plead guilty. (Trial issue 17)

9.   Prosecutorial misconduct. (Trial issue 16)

2

10. Right to a fair trial. (Trial issue 23)

There were errors in the course of trial and, in our view, the cumulative effect of these errors requires a new trial. The judgment is, therefore, reversed.

## I. Facts

At approximately 3:00 p.m. on January 8, 1995, Rodney Vaughn was driving to his mother's house in rural Rutherford County when a construction worker flagged down his vehicle. When Vaughn stopped, the worker, who was unable to speak English, led him to a place where he could see what appeared to be a blanket covering a body in a steep ravine some twenty feet from the road. Vaughn telephoned 911, met the sheriff's officers who responded to the call, and led them to the body of a young man clad only in blue jeans. A plaid sleeping bag covered the upper portion of the body. No identification was found. An autopsy established ligature strangulation as the cause of death. Marks on the body indicated that the feet and hands had been bound. There was a small gash on the back of the head. The body had other marks and bruises and the pubic hair had been recently shaved.

During this period of time, Detective Melvin Cunningham of the Murfreesboro Police Department had been investigating the disappearance of a nineteen-year-old college student, Joseph Ladd. His employer notified his family when Ladd did not report for work on the fifth and sixth of January. His roommates had not seen Ladd. Shortly after initiating his investigation, Detective Cunningham interviewed Warren Jones and the defendant. Both men acknowledged that they last saw Joey Ladd on the evening of the third of January. Jones and Ladd, co-workers with the defendant at the Garden Plaza Hotel in Murfreesboro, had gone to the defendant's apartment to drink some beer and talk. When Jones left at about 1:30 a.m., Ladd

3

declined a ride, explaining that he would walk home. The defendant claimed that Ladd left a few minutes after Jones departed.

When Detective Cunningham learned of the discovery of the unidentified body, he went to the morgue and determined that the deceased met Ladd's general description. When Ladd's roommate came to the morgue, he was able to make a positive identification.

The day after the body was found, investigators established that the sleeping bag belonged to James Andrew Starnes, a friend of the defendant. Starnes told the officers that he had probably left the bag at the defendant's apartment.

At noon on January 10, Detectives Mark Warf and Cunningham interviewed the defendant, a thirty-four-year-old college student at Middle Tennessee State University, at his apartment. The defendant first claimed that the three men went to his apartment after work, drank some beer, listened to music, and talked. He said that at about 1:30 a.m., Jones left and that Ladd left shortly thereafter. The defendant signed his statement and consented to a search of his apartment. The detectives found a paint ball gun and other paint ball equipment, leather straps, hair clippers, and some catalogs.[1]

Later that afternoon, the defendant telephoned Detective Warf and told him that he had more information. When the detectives returned, the defendant

---

[1] The record of the hearing on the motion to suppress indicates that the catalogs displayed pornographic material and a variety of sexual apparatus. The wrapper that contained the catalogs showed that the defendant had received them after Ladd's death. The defendant told the police that he did not like the catalogs and had planned on sending them back. The jury heard nothing about the content of the catalogs.

4

revealed that he was gay, but did not engage in homosexual relationships. He claimed that only one person was aware of his homosexuality.

After officers interviewed Warren Jones that evening, the defendant was brought to the sheriff's department for further questioning. He arrived at the station at about 11:30 p.m. The interview continued throughout the night, and at approximately 5:00 a.m. the defendant signed his second written statement. In this document, he acknowledged that his actions caused in the death of Joey Ladd. The defendant did not testify at trial. The interview at the sheriff's department was recorded. Both the audiotape and the written statement were entered into evidence at trial.

The defendant told officers that he and Jones, a twenty-four-year-old student at Middle Tennessee State University, had become concerned about Ladd's excessive drinking and partying. They decided to approach Ladd after work and talk to him about his reckless lifestyle. They recalled driving Ladd to his apartment on Tuesday, January 3, at about 10:30 p.m. Jones followed in his own car. He related that for the next two hours the men talked about paint ball, school, work, and girl friends. According to Jones, Ladd drank an entire six pack of "tall boys" and then began drinking Jagermeister. The defendant drank beer and then switched to orange juice and vodka. At 1:30 a.m., January 4, Jones left because he wanted to write a letter to his fiancée.

The defendant claimed that he and Ladd continued to drink and that the talk turned to sex. The defendant told the officers that he admitted his homosexuality and that Ladd revealed that he had some unexplored bisexual interests. The defendant said that he and the victim went into the bedroom and engaged in consensual sexual activity. The defendant contended that he was unable to obtain an erection and the

5

victim penetrated him anally. The defendant stated that he then used a finger to penetrate the victim and at some point after the first sexual encounters, shaved the victim's pubic hair. The two men then discussed bondage, a topic that the defendant acknowledged had been the frequent subject of his sexual fantasies. The defendant obtained two pairs of handcuffs belonging to his roommate, a military policeman in the Army Reserve. He claimed that his wrists and ankles were shackled by the victim. When the defendant still was not sufficiently aroused, he then placed the cuffs on the victim as he lay face down on the bedroom floor.

By this time it was after 5:00 a.m. and the two had been drinking steadily throughout the night. Still hoping to achieve an erection, the defendant placed one of the victim's socks in the victim's mouth and secured it with duct tape. He admitted to others that he took the victim's rugby shirt, wrapped it around his head and neck and while seated on the victim's back, he began to ride "like a horse" pulling straight back on the shirt with both hands. The defendant realized at some point the victim was struggling and choking. By the time he stopped, the victim was silent. The defendant recalled that he took out the gag, removed the handcuffs, and dragged the unclothed victim onto the bunk bed.

The defendant told officers that he thought the victim had passed out from all the alcohol. Later the defendant realized the victim was not breathing. When he was unable to locate a pulse, the defendant became frantic and, while conceding that he should have called authorities, he did not. The statement is not clear as to the exact order in which the following events occurred, but, at some point, the defendant dressed the body in underwear and jeans, placed it in a sleeping bag, and dragged the body to the foot of the stairs where it would rest on cold concrete. The defendant noticed that the victim had a cut on the back of his head as he placed the body in a

6

sleeping bag. The defendant told officers that he may have banged the victim's head against the upper rail of the bunk bed when he was trying to get him into the bunk. He took the victim's wallet, drove around for a while, and eventually threw the wallet off a slab bridge into a creek.[2] At 3:00 p.m., the defendant reported for work, taking the victim's shirt, boots, socks, and backpack with him. He threw them into the dumpster behind the hotel.[3]

When the defendant returned home from work that night, he dragged the body to his car and placed it in the trunk. He told officers that he noticed that there was blood on both the sleeping bag and the floor from the cut on the victim's head. He recalled that he drove to a secluded place near a paint ball field and dragged the body to a ditch. He then covered the body with the sleeping bag and returned to his apartment to clean the blood from the stairwell floor and that on the bumper of his car.

At trial, Dr. Charles Harlan, the medical examiner, testified that death had been caused by ligature strangulation and that the faint pale pink marks around the neck were consistent with having been caused by a broad piece of cloth. Dr. Harlan found no evidence of forced penetration, no scarring or tears to the anus. The victim's blood alcohol level was .19 at the time of his death. It was Dr. Harlan's opinion that if the victim's blood alcohol level had reached .21, he could have vomited or become comatose. He stated that the bruises on the wrists and ankles were likely made by thin bands and that the abrasions on the victim's fingertips were probably the result of being scraped across some firm surface. Dr. Harlan testified that the victim had a laceration on the back of his head that was four-fifths of an inch in length. It was his opinion that

---

[2]    A passer-by noticed the wallet floating in the water and retrieved it. When he was unable to locate Ladd, he turned the wallet over to the sheriff's department.

[3]    These items were never recovered as they had been taken to the landfill prior to the discovery of the victim's body.

7

the victim's injuries could have been the result of a struggle although he conceded that they could have been caused either just before or just after death had occurred.

Both Jacob Cook, the defendant's roommate for four years, and Jones, his long-time friend, testified for the state. Neither man had any idea that the defendant had homosexual proclivities. Cook, who was staying in Nashville with his parents at the time of Ladd's death, recalled being unable to find his handcuffs and asking the defendant to look for them. Jones corroborated the defendant's statements about many of the events that occurred during the evening of January 3 and until 1:30 a.m. the next day.

James Andrew Starnes, another friend of the defendant, testified that he had known the defendant both at work and at school. He had often been to the defendant's apartment along with other co-workers and college friends. Because he had noticed that the defendant seemed uncomfortable around women, he once asked if he was gay. The defendant acknowledged that he was.

All three men testified that the defendant had never made any sexual advances toward them. The defendant and Cook slept in the same room and Starnes had frequently spent the night in his apartment.

The state introduced photographs showing the bruises and other injuries to the victim, photographs of the defendant's apartment, a picture of the contents of the defendant's refrigerator, and a videotape of the body as it was found.

At the conclusion of the proof, the trial judge granted the defendant's motion for a judgment of acquittal on the charge of first degree premeditated murder

8

and announced that he would instruct the jury only on felony murder and second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide. Just before the case was sent to the jury, the defendant attempted to plead guilty to second-degree murder. When the state objected, the trial court refused to accept the plea. The jury then returned a guilty verdict of felony murder committed in the perpetration either of a rape or of an attempted rape.

## II. Sufficiency of the Evidence

### A.

A peculiar problem arises in conjunction with our consideration of the sufficiency of the evidence. The jury found the defendant guilty of felony murder committed in the perpetration of a rape or in the perpetration of an attempted rape. See Tenn. Code Ann. § 39-13-202 (a) (2) (1997). The evidence established two distinct and separate sexual episodes. In the first, the defendant digitally penetrated the victim's anus. During the second episode, the defendant attempted unsuccessfully to penetrate the victim with his penis. The defendant admitted that these actions occurred. The issue at trial was consent. At various points in the trial, the state argued that none of the sexual activity was consensual and that the defendant at first digitally penetrated and then either strangled the victim while attempting to rape him a second time or killed him to prevent his telling anyone about the homosexual encounter. In the final sentence of the closing argument, however, the state asked the jury to return a verdict of guilty of murder during the perpetration of an attempted rape. Both the indictment and the jury instruction use the disjunctive, as does Code section 39-13-202(a) (2), and the jury returned a verdict finding the defendant guilty of felony murder in the perpetration of a rape or in the attempted perpetration of a rape. The judgment form entered by the trial court reports that the defendant either raped or attempted to rape the victim. Confusion is apparent in the briefs submitted to this court. The

9

defendant argues that there is insufficient evidence of rape while the state argues that there is ample evidence in the record to support a conviction based on attempted rape. The trial court neither gave an augmented unanimity instruction nor required an election of "offenses" to ensure that all twelve jurors agreed on the same set of facts for the underlying felony.

Although neither party raises the issue of jury unanimity, we briefly consider the issue under the plain error standard in order to do substantial justice. State v. Adkisson, 899 S.W.2d 626, 636 (Tenn. Crim. App. 1984); Tenn. R. Crim. P. 52(b). A defendant has the fundamental constitutional right under Tennessee law to a unanimous verdict before a conviction for a criminal offense may be imposed. State v. Shelton, 851 S.W.2d 134, 137 (Tenn. Crim. App. 1993); State v. Brown, 823 S.W.2d 576, 581 (Tenn. Crim. App. 1991); see also State v. Brown, 762 S.W.2d 135, 137 (Tenn. 1988). Protection of this right may require special precautions by the trial court to ensure that the jury does not reach a "patchwork verdict" based on different offenses. State v. Forbes, 918 S.W.2d 431, 445-446 (Tenn. Crim. App. 1995). When the proof shows the commission of multiple acts with multiple results, the results being separate criminal offenses, and there are insufficient counts in the charging instrument to accomodate all of the offenses shown, the usual precaution to assure jury unanimity is to require the election of offenses. Shelton, 851 S.W.2d at 137; State v. Burlison, 501 S.W.2d 801 (Tenn. 1973); State v. Clabo, 905 S.W.2d 197, 205 (Tenn. Crim. App. 1995). However, where there is only one offense resulting from multiple actions of the defendant, see State v. Phillips, 924 S.W.2d 662 (Tenn. 1996), the proper precaution is giving to the jury an augmented instruction relative to the unanimity requirement. State v. James R. Lemacks, No. 01C01-9606-CC-00227, slip op. at 12-13 (Tenn. Crim. App., Nashville, June 26, 1997), pet. for perm. app. filed (Tenn. Aug. 25, 1997); Brown, 823 S.W.2d at 581-83.

10

Although the wording of the indictment, the trial court's instructions, and the jury verdict raise the specter of a "patchwork verdict," we find that no "real potential" for a non-unanimous verdict exists.[4] Because of the peculiar facts in this case, a juror who concluded that the first sexual encounter was non-consensual would have to arrive at the same conclusion about the second encounter.

The indictment, the verdict, and the judgment all refer to a "rape or attempted rape." In its closing argument, the state contended that the killing was during an attempted rape. Both the state and the defense referred to the underlying felony as "rape or attempted rape" throughout the trial. For example, defense counsel claimed, "This is not a case of rape or attempted rape." At one point, the state interjected that it did "not have to prove a rape occurred, either a rape or attempted rape, and that's the charge in the indictment." That instructions on attempt were not provided to the jury might have added to the confusion about which of the two underlying felonies was chosen to support the verdict.

---

[4] Although the definition of felony murder invited the jury to find the defendant guilty of felony murder in the perpetration of a rape or in the attempted perpetration of a rape, Tenn. Code Ann. § 39-13-202(a)(2), we do not intend to suggest that this use of alternative theories in the statute, the indictment, and the jury instructions raises unanimity concerns. Generally, alternative theories, mental states, modes of committing the crime, or means by which the crime was committed may be submitted to the jury without the necessity of precautions to assure jury unanimity. Tenn. Code Ann. § 40-18-112 (1997); see also Schad v. Arizona, 501 U.S. 637, 111 S. Ct. 2491 (1991); State v. Daniel Joe Brown, No. 02C01-9611-CC-00385, slip op. at 16-17 (Tenn. Crim. App., Jackson, Dec. 3, 1997). In a given case, such as the present case, the coincidence of alternative theories and the defendant's commission of multiple criminal acts tends to disguise the basis for the appellate court's detection of a unanimity problem, see VanArsdall v. State, 919 S.W.2d 626, 633 (Tenn. Crim. App. 1995); Forbes, 918 S.W.2d at 445, that basis being the multiplicity of the acts committed by the defendant. State v. Tidwell, 922 S.W.2d 497 (Tenn. 1996); Shelton, 851 S.W.2d at 137; Burlison, 501 S.W.2d 801; Daniel Joe Brown, slip op. at 15-16; VanArsdall, 919 S.W.2d at 633; Clabo, 905 S.W.2d at 205; Brown, 823 S.W.2d at 581-82; but see State v. James R. Lemacks, No. 01C01-9606-CC-00227, slip op. at 11-13.

Nonetheless, "[a]s long as the jury unanimously agreed that the second encounter was an attempted rape, it is irrelevant that some jurors may have believed that the first penetration also occurred without the victim's consent." Furthermore, it is the felony that enhanced the homicide to one of first degree murder. To reach that conclusion, the jury had to be unanimous in rejecting the defense of consent, which was a prerequisite to the determination that the felony was committed.

There are very limited instances wherein a harmless error analysis is appropriate in the resolution of election or unanimity issues. In Shelton, our supreme court found harmless error where the victim testified in detail about one incident of sexual abuse and testified generally about other instances. Shelton, 851 S.W.2d at 138. Our supreme court was able to determine that "the jurors must have considered the evidence of this particular incident in convicting the defendant of aggravated rape ... [and] the Burlison error as to this conviction was harmless beyond reasonable doubt." Id. Also, in Clabo, this court found harmless error where the victim testified about and was questioned about "one precise incident." A panel of this court concluded that "minor innuendos about another incident were harmless." Id. at 205. Thus, a harmless error analysis is appropriate only where the proof overwhelmingly established the offense for which conviction is sought and proof of the other crimes is marginal or tangential. See also State v. Daniel Joe Brown, No. 01C01-9611-CC-00385, slip op. at 20 (Tenn. Crim. App., Jackson, Dec. 3, 1997) (finding the election error harmless where although the evidence "technically" may have established two separate incidents of reckless endangerment, there was proof in "great detail" about only "one particular instance.")

In Brown, Judge Tipton, speaking for this court, made the following

12

comment:

> In a case where the evidence shows that the defense is, simply, <u>a denial that any offense occurred</u> and that the evidence in favor of the state's position is of a similar quality as to each offense proven and is derived from the same witness(es), then it is extremely difficult to imagine that a potential exists of the jury splitting its findings. <u>Such a clear cut case would not seem to call for an augmented unanimity instruction, since the accrediting of the witnesses as to one offense would necessarily accredit them as to the others</u>.

823 S.W.2d at 584 (emphasis added).

This type of harmless error analysis was not embraced by our supreme court in its two most recent opinions on this issue. See State v. Walton, 958 S.W.2d 724 (Tenn. 1997), and Tidwell v. State, 922 S.W.2d 497 (Tenn. 1996). In Tidwell, the petitioner was convicted of 14 counts each of rape, incest and contributing to the delinquency of a minor. 922 S.W.2d at 498-99. The victim testified that sexual activity occurred with her father "approximately once a week" over a fourteen month period. The victim testified in general terms. She was, however, able to testify with particularity to incidents that occurred in December 1985 and in April 1986. Id. The defendant confessed to having had sexual intercourse with the victim and acknowledged the last incident occurred in January 1987. Id. The defendant filed a post-conviction petition alleging ineffective assistance of counsel for failure to seek election of offenses. Id. at 499. Reiterating the rule announced in Burlison and affirmed in Shelton, our supreme court reversed all of the convictions except for those in which the defendant had confessed (the January 1987 incident) and those for which the victim testified to with particularity (the December 1985 and April 1986 incidents). In Tidwell, the state had argued that "non-unanimity was impossible" and that "jury unanimity is attained in such cases because, although the jury may not be able to distinguish between the various acts, it is certainly capable of unanimously agreeing that they took place in the number and manner described." Id. at 501 (discussing the state's position). Our supreme court

13

rejected the state's argument that because "non-unanimity was impossible," a reversal of the convictions was not required:

> [The state's] approach, in our view, is akin to a "grab-bag" theory of justice. To illustrate the operation of this theory, in any given case the State could present proof on as many offenses ... as it chose. Because all such offenses will have been "proven," the jury may ... reach into the brimming bag of offenses and pull out one for each count. ... [S]uch an approach is contrary to our law.

Id.

In Walton, the supreme court found plain error meriting a reversal because "each juror was left to choose independently the acts of abuse upon which to base a verdict. This is the grab bag result condemned in Tidwell. We have no means here by which we can be assured that each juror relied upon the same evidence to convict the defendant." Walton, 958 S.W.2d at 727-28.

A harmless error analysis on a unanimity issue must always be based upon the particular facts of the case. As indicated, the defendant did not deny either of the sexual encounters and the only issue was whether there was consent, a notion unanimously rejected by the jury. This assures the "well established right under our state constitution to a unanimous jury verdict...." Shelton, 851 S.W.2d at 137. This conviction is either "grab bag" or "patchwork" as precluded by the holdings in Walton or Shelton. The particular facts here are much less vulnerable to confusion in the context of a felony murder.

The circumstances in Schad v. Arizona, 501 U.S. 624, 111 S. Ct. 2491 (1991), may be analogous. The United States Supreme Court concluded that a jury need not agree on which overt act, among several possible alternatives, was the means by which a crime was committed. The crime here was that of felony murder, a verdict

14

upon which there was unanimous consent.  That not only required a rejection of the defense claim of consent but a conclusion that, at a minimum, each of the elements of attempted rape was established beyond a reasonable doubt.  These circumstances fit within that limited, harmless error category on the issue of jury unanimity.[5]

## B.

The defendant does not deny that his actions caused the victim's death. He contends, however, that the evidence does not demonstrate that he forced the victim to engage in the sexual activity during which the victim was killed.

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review  is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P.  13(e).  This rule is applicable to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence.  State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990).

---

[5]    In State v. Tony Scott Walker, No. 02C01-9704-CC-00147, slip op. at 6 (Tenn. Crim. App., Jackson, Dec. 3, 1997), app. pending, Feb. 4, 1998, a panel of this court held as follows:

> In order to prove felony murder, the State need not prove the actual commission of the underlying felony; rather, the State must prove only that murder was committed in the perpetration of or attempt to perpetrate the underlying felony. See State v. Allen, No. 02C01-9307-CR-00166 (Tenn. Crim. App., at Jackson, Aug. 24, 1994).  Moreover, we note that attempted robbery is a lesser included offense of robbery. See Bandy v. State, 575 S.W.2d 278, 281 (Tenn. 1979).  Accordingly, we do not agree with the appellant that the trial court's instruction provided alternative theories from which members of the jury could choose in finding the appellant guilty of murder committed in the perpetration of a felony.

In determining the sufficiency of the evidence, this court should not reweigh or reevaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956); Farmer v. State, 574 S.W. 2d 49, 51 (Tenn. Crim. App. 1978). On the contrary, this court is required to afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

The appellant was tried and convicted by a jury. A guilty verdict from the jury, approved by the trial judge, accredits the testimony of the state's witnesses and resolves all conflicts in favor of the state. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); State v. Hatchett, 560 S.W.2d 627, 639 (Tenn. 1978). Since a verdict of guilty removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of demonstrating why the evidence is insufficient, as a matter of law, to support the verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A criminal offense may be established exclusively by circumstantial evidence. Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); State v. Jones, 901 S.W.2d 393, 396 (Tenn. Crim. App. 1995); State v. Lequire, 634 S.W.2d 608 (Tenn. Crim. App. 1981). Before an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." State v. Crawford, 225 Tenn. 478, 484, 470 S.W.2d 610, 613 (1971); Jones, 901 S.W.2d at 396. In other words, "[a] web of guilt must be woven around the

16

defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." Crawford, 225 Tenn. at 484, 470 S.W.2d at 613; State v. McAfee, 737 S.W.2d 304, 305 (Tenn. Crim. App. 1987).

If properly instructed by the trial court, the assessment of whether the direct and circumstantial evidence excludes other likely possibilities is a jury question. Our scope of review is more limited. The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as triers of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978).

In our view, a jury is entitled to accept that portion of the defendant's pre-trial statement or testimony that it deemed credible and reject that which it deemed to be false. State v. Gilbert, 612 S.W.2d 188, 190 (Tenn. Crim. App. 1980)(citing Batey v. State, 527 S.W.2d 148 (Tenn. Crim. App. 1975)). "In confessions or statements of the kind voluntarily made by the accused the jury must take the whole of this statement or confession and weigh it as they weigh the other evidence, rejecting some part if they desire to do so and giving credit to other parts of the statement if they have a sufficient reason to do so under all the evidence as it is introduced." Espitia v. State, 288 S.W.2d 731, 733 (Tenn. 1956). This quote from the Espitia opinion is consistent with the general rule:

> It is for the jury to say what weight shall be given to the several parts of the statement, for they may well believe that part which charges the prisoner, and reject that which tends to exculpate him.

20 Am. Jur., Evidence, § 488 (1939 & Supp. 1966); see 29A Am. Jur. 2d, Evidence, § 1431 (1994).

The legislature defined first degree murder as "[a] reckless killing of another committed in the perpetration of, or attempt to perpetrate any ... rape ...." Tenn. Code Ann. § 39-13-202(a)(2) (Supp. 1994). Rape is defined as the "unlawful sexual penetration of a victim by the defendant or of the defendant by the victim accompanied by any of the following circumstances: (1) Force or coercion is used to accomplish the act; (2) The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless...." Tenn. Code Ann. § 39-13-503 (emphasis added) . As no specific mens rea is required by the rape statute, "intent, knowledge or recklessness suffices to establish the culpable mental state." Tenn. Code Ann. § 39-11-301(c) (emphasis added) .

To convict an accused of criminal attempt, the state must prove beyond a reasonable doubt that an accused who acted with the kind of culpability otherwise required for the offense

(1)     [i]ntentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

(2)     [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3)     [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1),(2),(3) (1991).

To find the defendant guilty of felony murder in this case, the jury had to find beyond a reasonable doubt that the defendant, acting with the intent to commit a

18

forcible rape, intentionally engaged in actions that would result in a rape, and that during these acts, the defendant recklessly killed the victim. If the victim consented to the sexual activity, no attempt to rape occurred, and the defendant cannot be convicted of felony murder.

The trial court instructed the jury that the essential elements for felony murder were as follows:

(1) The defendant unlawfully killed the victim, and
(2) That the killing was committed in the perpetration of or the attempted perpetration of an alleged rape; that is, that the killing was closely connected to the alleged rape or attempted rape and was not a distinct or independent event, and
(3) That the Defendant intended to commit the alleged rape or attempted rape, and
(4) That the killing was the result of a reckless act by the Defendant.

While no instruction was provided on the statutory definition of attempt, the trial court did provide the following charge on circumstantial evidence:

Circumstantial evidence consists of proof of collateral facts and circumstances which do not directly prove the fact in issue, but from which that fact may be logically inferred. When the evidence is made up entirely of circumstantial evidence, then before you would be justified in finding the Defendant guilty, you must find that all the essential facts are consistent with the hypothesis of guilt, as that is to be compared with all the facts proven.

The facts must exclude every other reasonable theory or hypothesis except that of guilt, and the facts must establish such a certainty of guilt of the Defendant as to convince the mind beyond a reasonable doubt that the Defendant is the one who committed the offense....

In the light most favorable to the state, the pretrial statement establishes that the victim penetrated the defendant with his penis and the defendant digitally penetrated the victim. According to the defendant, the victim then passed out. When the victim regained consciousness, the defendant handcuffed the victim's arms behind

19

his back and also handcuffed the victim's ankles. At some point, he shaved his pubic hair. The defendant stuffed a sock into the mouth of the victim, who was highly intoxicated and lying face down on the floor, and then placed duct tape around the victim's head and mouth as he attempted to talk. The defendant told officers he then mounted the victim's back, attempting to achieve an erection, and then wrapped a T-shirt around the victim's neck and pulled. The defendant did not respond to the victim's struggles or his choking and did not release his hold until the victim lay motionless.

While a medical examination of the victim failed to indicate trauma to the genital or rectal areas, the defendant admitted that he shaved the unconscious victim's pubic area without consent. The defendant, some fifteen years older than the victim, claimed that the sexual penetration and the bondage were consensual but acknowledged that the victim, who had no known history of homosexuality, was very drunk. A medical examination established the victim's blood alcohol level to be .19 at the time of his death. The proof suggests that the alcohol level could have been higher prior to his death; the defendant's concession that the victim had lost consciousness before the second sexual encounter tends to corroborate that.

When he discovered that the victim was not breathing, the defendant disposed of the victim's wallet in a nearby river and discarded his shirt, boots, and backpack into the dumpster at his workplace. On the following evening, the defendant drug the body to his car, placed it in the trunk, and drove to a remote location before disposing of the body. The defendant cleaned any traces of the incident and, when first questioned by police, the defendant denied any knowledge of the victim's death or whereabouts. A second statement to police was equally untruthful.

20

Initially, the evidence establishes at least a reckless killing. By continuously pulling on a T-shirt wrapped around the neck of the struggling, choking victim, the defendant caused his death by consciously disregarding a substantial and unjustifiable risk. The defendant acknowledged his failure to release his hold until the victim ceased to move. The jury had a rational basis for determining the presence of an adequate mens rea.

Secondly, even though a medical examination was unsuccessful in confirming any sexual penetration of the victim, the defendant's statement, if believed, established an intentional penetration or attempted penetration of the victim that eventually resulted in the strangulation of the victim. The jury is entitled to utilize its common sense in evaluating the entirety of the evidence. In our view, the jury had a rational basis for determining that force or coercion was used or that the victim, because of his level of intoxication, was too "mentally incapacitated or physically helpless" to offer resistance. Tenn. Code Ann. § 39-13-503. Despite the vigorous claims on the part of the defendant that the sexual encounters were completely consensual, many of the surrounding circumstances suggest otherwise as to the second encounter. Alcohol overuse had resulted in the loss of consciousness of the victim at one point. The jury could have reached a verdict of guilt for a reckless killing during the perpetration of a rape or attempted rape.

Thirdly, the jury could have reasonably concluded from the evidence that the defendant bound and gagged an unconscious victim, mounted the victim, and pulled the T-shirt which was wrapped around his neck until he died. The jury could infer that restricting the victim's freedom of movement, shaving pubic hair without permission and subduing possible cries for help were substantial steps towards penetration of the victim. It might properly determine that the restraint on the victim implied force or

21

coercion. See State v. McKnight, 900 S.W.2d 36 (Tenn. Crim. App. 1994) (force could be found from the defendant holding the victim down). There were unexplained injuries to the fingertips of the victim. The jury could also have reasonably concluded from the medical evidence that the victim was either "mentally incapacitated or physically helpless." It could have rationally disregarded the claim that the victim consented to the encounter and at the same time accredited other portions of the defendant's statement.

The concealment of the body and disposal of the body, the wallet and the other personal items of the victim were all corroborative of guilt, tending to refute the claim of consent. Ashcraft v. Tennessee, 327 U.S. 274, 278, 66 S. Ct. 544, 546 (1946)(willful concealment of material facts relating to crime is considered evidence of guilt). So was lying to the police. "[S]tatements denying guilt followed by a confession ... may carry the strongest implications of a guilty knowledge." Id. The evidence, when considered in the light most favorable to the state, is sufficient to support a felony murder verdict. A rational trier of fact, in the opinion of the majority, could have found the essential elements of the crime beyond a reasonable doubt.

### III. Issues Relating to the Defendant's Statements

### A. Motion to Suppress

The defendant contends that both his final oral and written statements were given in violation of his rights under the United States and Tennessee constitutions. The state, on the other hand, argues that the defendant knowingly and voluntarily waived his Miranda rights and that he never invoked his right to counsel as a protection against self-incrimination. See Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966). After a careful review of the record and the applicable law, we find the actions of the authorities in this case did not violate the defendant's constitutional rights as guaranteed under the Fifth Amendment of the United States Constitution and Article

22

1, Section 9 of the Tennessee Constitution.[6]

Evidence presented at the hearing on the motion to suppress indicates that at approximately 11:30 p.m on the night of January 9, 1995, the defendant agreed to accompany two police officers to the station for further questioning in regard to the death of Joey Ladd. Although the equipment for videotaping the interview malfunctioned, a tape recorder preserved the audio portion. The defendant read and signed a standard form waiving his constitutional rights. About five minutes into the interview and before he made any incriminating statements, the defendant said, "I'm sorry, I'm just wondering if I should have a lawyer." This statement on the tape is followed by a long blast of static that lasts for several seconds. When questioned about what transpired during this time, Detective Warf conceded that he did not recall all that he had said. However, he knew that he had asked the defendant, "Do you need an attorney to help you tell the truth?" and that the defendant had replied, "No." The defendant, who testified at the suppression hearing, did not contradict Warf's testimony. He recalled nothing of what was said except the single question to which the detective testified. The record indicates that the interview began sometime around midnight and that the defendant began his written statement at approximately 3:00 a.m. During the interview, the defendant refused the first offer of something to drink but

---

[6]     We note that the defendant's Sixth Amendment right to counsel is not implicated in this case. Davis v. United States, 512 U.S. 452, ---, 114 S. Ct. 2350, 2354 (1994). A defendant's Sixth Amendment right to counsel attaches when "formal adversary judicial proceedings " begin. Moore v. Illinois, 434 U.S. 220, 266 (1977); Kirby v. Illinois, 406 U.S. 682, 688 (1972). The Court has not, however, specified the precise point at which those proceedings begin. Generally, a mere arrest will not trigger the Sixth Amendment right to counsel at a pretrial confrontation. Moore, 406 U.S. at 228. In Tennessee, the initiation of adversary proceedings begins with either a formal charge such as an arrest warrant, at the time of the preliminary hearing if there was no formal warrant, or by indictment or presentment. State v. Bush, 942 S.W.2d 489 (Tenn. 1997) (citing Mitchell v. State, 593 S.W. 2d  280, 286 (Tenn.), cert. denied, 449 U.S. 845 (1980)).

accepted a second offer at the conclusion. The defendant did not ask to leave, and, other than the one question concerning an attorney, the record contains no indication that the defendant expressed any further desire to talk to an attorney or that he was coerced in any way.

At the conclusion of the suppression hearing, the trial court found that the defendant made an equivocal request for an attorney, that the detectives made no attempt to clarify the intent of the defendant's statement, and that the defendant proceeded to give his statement without duress or intimidation. Based on the totality of the circumstances, the trial court concluded that the defendant gave his statement knowingly and voluntarily after a valid waiver of his constitutional rights.

The standard of review applicable to suppression issues is well established. When the trial court makes a finding of facts at the conclusion of a suppression hearing, the facts are accorded the weight of a jury verdict. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). These facts are binding upon this court unless the evidence in the record preponderates against the findings of the trial court. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); see also Stephenson, 878 S.W.2d at 544.

> Questions of credibility of witnesses, the weight and value of the evidence and resolution of conflicts in evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

Odom, 928 S.W.2d at 23. The only question we must address is whether the police officers' failure to clarify the defendant's ambiguous request violated his right to the assistance of counsel, as recognized by Miranda and Edwards v. Arizona, 451 U.S.

24

477, 101 S. Ct. 1880 (1981).

It is undisputed that when a defendant clearly requests an attorney during custodial interrogation, further questioning by the police in the absence of an attorney is constitutionally prohibited. Edwards, 451 U.S. at 485, 101 S. Ct. at 1885. Our supreme court has previously held that, "when a suspect makes an ambiguous or equivocal request for counsel, further questions by officers must be limited to clarifying the suspect's desire for an attorney." Stephenson, 878 S.W.2d at 548. However, several months after Stephenson was decided, the United States Supreme Court addressed the issue of ambiguous requests for counsel. The Court stated that

> Of course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney . . . . but we decline to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him.

Davis v. United States, 512 U.S. 452, ____, 114 S. Ct. 2350, 2356 (1994) (emphasis added). The declared effect of Davis is that "[u]nless the suspect actually requests an attorney, questioning may continue." Davis, 512 U.S. at ____, 114 S. Ct. at 2357.

In State v. Huddleston, 924 S.W.2d 666 (Tenn. 1996), our supreme court revisited the issue. In Huddleston, the defendant claimed that his refusal to sign the waiver of rights form constituted an invocation of his Fifth Amendment right to counsel. Id. at 669. The Huddleston court cited Davis for the proposition that when a suspect does not make a clear and unambiguous request for an attorney, the police need not terminate the interrogation. Huddleston, 924 S.W.2d at 669-670. The Tennessee Supreme Court stated as follows:

> In Miranda, the Supreme Court did not adopt a rigid formula for invocation of the Fifth Amendment right to counsel. Recently in Davis v. United States, 512 U.S. 452,

25

> 114 S. Ct. 2350, 129 L.Ed.2d 362 (1994), however, the Court stated that "[i]nvocation of the Miranda right to counsel requires, at a minimum, <u>some statement that can be construed to be an expression of a desire for the assistance of an attorney.</u>" Id. ___ U.S. at ___, 114 S. Ct. at 2355. (internal quotations omitted). <u>"Although a suspect need not speak with the discrimination of an Oxford don"</u> the Court emphasized that a suspect <u>"must articulate his desire to have counsel present sufficiently clearly that a reasonable officer would understand the statement to be a request for an attorney.</u>"

Huddleston, 924 S.W.2d at 669-70 (emphasis added). Therefore, the court concluded that if a defendant knowingly and voluntarily waives his Miranda rights, the police may continue questioning the suspect until and unless the suspect clearly requests an attorney. Id.

We note that Huddleston was decided under the Fifth Amendment to the United States Constitution. The opinion does not mention Article 1, Section 9 of the Tennessee Constitution. We are also aware that our supreme court has held that Article I, Section 9 of the Tennessee Constitution provides similar but broader protection for an accused than does the Fifth Amendment. See State v. Crump, 834 S.W.2d 265, 268 (Tenn.), cert. denied, 506 U.S. 905, 113 S. Ct. 298 (1992); see also State v. Farmer, 927 S.W.2d 582, 593-594 (Tenn. Crim. App. 1996).[7]   Crump, however, was a case in which the defendant had invoked his right to be silent rather than the right to counsel and was decided before the United States Supreme Court's decision in Davis.

---

[7]   State v. Farmer was decided prior to the supreme court's decision in Huddleston. The opinion does not mention the United States Supreme Court's decision in Davis. Farmer, 927 S.W.2d at 593-594. The court cited Stephenson for the proposition that when a suspect makes an equivocal request for counsel, the officers must limit future questions to those needed to clarify the request. However, the court remanded the case to the trial court for determination of whether the defendant made a request for counsel, equivocal or not. Farmer, 927 S.W.2d at 594.

The right to counsel under the Fifth Amendment as established by Miranda is a procedural safeguard and, unlike the privilege against self-incrimination itself, is not independently a constitutional right. Michigan v. Tucker, 417 U.S. 433, 443-444, 94 S. Ct. 2357, 2363, 2364 (1974). We cannot say that our supreme court's statement that the Tennessee Constitution is more protective of the privilege against self-incrimination than the Fifth Amendment is applicable in the context of a procedural safeguard.

In State v. Jack Jay North, Jr., No. 02C01-9512-CC-00369 (Tenn. Crim. App., Nashville, Dec. 9, 1996), perm. app. denied (Tenn. 1997), the proof indicated that the defendant asked the detective if he needed an attorney. Jack Jay North, Jr., slip op. at 31. The court considered the request to be equivocal and, based on the holdings in Huddleston and Davis, held, under the state and federal constitutions, that "because the appellant knowingly and voluntarily waived his Miranda rights, [the police] could continue questioning the appellant 'until and unless [the appellant] clearly request[ed] an attorney.'" State v. Jack Jay North, Jr., slip op. at 32. The Tennessee Supreme Court denied North's application for permission to appeal.[8]

---

[8] In State v. John M. Ake, No. 01C01-9603-CC-00094 (Tenn. Crim. App., Nashville, June 6, 1997), app. denied (Tenn. 1998), the lead opinion written by Judge Joe G. Riley followed the lead of North and concluded that our supreme court approved the holding of Davis in Huddleston and that the court gave no indication that Article I, Section 9 of the Tennessee Constitution would require a different result. John M. Ake, slip op. at 6. Therefore, Judge Riley found that the detectives had no obligation to clarify the defendant's ambiguous request and that neither his federal nor state constitutional rights had been violated. Judge Thomas T. Woodall concurred in the results but stated that the defendant's request was sufficiently clear that a reasonable police officer should have understood his statement to be a request for an attorney. Id., slip op. at 4 (Woodall, J., concurring). Judge Joseph M. Tipton wrote separately to dissent in the conclusion drawn in the lead opinion. He did not agree that the defendant's remarks were an unequivocal request for counsel but argued that Stephenson remains binding authority with respect to Article I, Section 9 of the Tennessee Constitution. John M. Ake, slip op. at 7 (Tipton, J., dissenting). However, all three panel members agreed that admission of the defendant's confession was, at most, harmless beyond a reasonable doubt. The supreme court denied Ake's petition for permission to appeal.

27

Although our supreme court did not tacitly overrule the Stephenson rule requiring the police to clarify an equivocal request for attorney, it adopted the Davis rule in the context of Huddleston. Moreover, even though the court agreed that "courts should give a broad interpretation to a suspect's request for counsel," this statement refers to the fact determination of whether a given request is equivocal and not to any broader interpretation of a defendant's rights to counsel under Article 1, Section 9 of the Tennessee constitution than those that flow from the Fifth Amendment.[9] Nothing in either Huddleston or Stephenson implies that the Tennessee constitution provides greater protection of a defendant's right to counsel during questioning than does the Fifth Amendment. Crump, as noted above, does not involve the right to counsel. The supreme court declined to review the decision in North in which this court concluded that Davis applied to the Tennessee Constitution as well the Fifth Amendment. Our intermediate court is bound by the decisions of our supreme court.

Therefore, we examine the trial court's denial of the defendant's motion to suppress his statements according to the rule adopted in Huddleston. The trial judge found that the defendant's request was ambiguous and that the police officers who were interrogating the defendant did not attempt to clarify the statement. The record does not preponderate against these findings. In fact, the defendant apparently

---

[9] The entire statement reads:

> Because we agree that courts should give a broad interpretation to a suspect's request for counsel, we conclude that the defendant's question herein constituted an equivocal invocation of the right to counsel that limited further interrogation to questions clarifying his desire for an attorney. Agent Davenport clarified the defendant's ambiguous statement by informing him that an attorney was immediately available if he wished to consult with him. . . As a result there was no violation of either the defendant's federal or state constitutional right to counsel.

State v. Stephenson, 878 S.W.2d at 548.

decided that he did not want an attorney because he proceeded to talk to the officers for the next several hours without again requesting counsel.[10] The trial judge also found that the defendant knowingly and voluntarily waived his constitutional rights and that the police did not coerce or intimidate him. The record supports these conclusions as well.

It would certainly be better practice for the interviewing officers to clarify whether or not a defendant actually wants an attorney. Clarifying questions help protect the rights of the suspect and will minimize the chances that a subsequent judicial determination will suppress the confession. See Davis, 512 U.S. at ____, 114 S. Ct. at 2356. The static on the tape following the defendant's comment is troubling; however, both the detective and the defendant gave the same account as to what followed, and the taped interview confirms the trial court's finding that the defendant was willing and even eager to unburden himself of the weighty guilt associated with the events that led up to this homicide. The defendant, a well-educated, articulate adult, never mentioned an attorney again during the four-hour interview. The defendant knowingly and voluntarily waived his Miranda rights, and, absent a clear request for an attorney, under Huddleston, the police were not required to clarify his statement nor to cease questioning. The trial court did not err in denying the defendant's motion to suppress his statements.

### B. Failure to Give Jury a Curative Instruction

The detectives who questioned the defendant frequently asked compound questions and interjected their own personal comments into their questions. For

---

[10] At the suppression hearing, the defendant testified that he thought his statement had offended Detective Cunningham, but he does not say that he was intimidated, coerced, or even cajoled into giving his statement without an attorney present.

example, at one point, the following colloquy took place:

| Detective Gage: | Now, I am just, I'm just totally wanting to know what happened on these fingers. You put him, wait, well we'll get back to those. When did you realize that he was dead? He's kicking, he's squirming, he's fighting, he's grunting and all of a sudden it stops. Now it's going to get slower. It's going to take less than five seconds for him to die or for him to pass out where he's not s t r u g g l i n g anymore. Ten, fifteen tops. |
|---|---|
| Young: | Yeah. |

Before the taped interview was played for the jury, defense counsel requested that the trial court instruct the jury that the comments and statements made by the detectives during the interrogation to which the defendant made no direct response were not to be taken as evidence. The prosecutor objected to the defense request because when a witness responds "yes" to a question, the witness has adopted the statement. The trial court did not give the instruction. On appeal, the defendant contends that the lack of a curative instruction denied him a fair trial.

The defendant correctly points out that the detective's interviewing techniques often failed to elicit clear responses. There were frequent interjections of conclusory statements. On the other hand, courts frequently admit into evidence tape

recordings of telephone calls, drug transactions, and interrogations involving not just the defendant but other parties as well. Tennessee law does not require that a trial court advise the jury to ignore all parts of a taped conversation other than the defendant's statements. The jury is to sort out the context of the recorded conversation and judge the weight of what it hears. See State v. Beasley, 699 S.W.2d 565, 569 (Tenn. Crim. App. 1985); State v. Harris, 637 S.W.2d 896, 898 (Tenn. Crim. App. 1982); State v. Lee, 618 S.W.2d 320, 322-323 (Tenn. Crim. App. 1981); State v. Smith, 612 S.W.2d 493, 498 (Tenn. Crim. App. 1980).

In this case, however, the trial court's disinclination to redact the police officers' conclusory statements from the defendant's confession or, in lieu of a redaction, its failure to provide the jury with a curative instruction, was erroneous. In State v. Jones, 598 S.W.2d 209, 223 (Tenn. 1980), abrogated by State v. Shropshire, 874 S.W.2d 634 (Tenn. Crim. App. 1993), superseded by statute State v. Latham, 910 S.W.2d 892 (Tenn. Crim. App. 1995), a taped conversation between a special agent and the defendant was admitted at trial; the defendant's statements were deemed admissions and thus exceptions to the hearsay rule. The trial court classified as non-hearsay the agent's statements because they were not admitted for their truth. In fact, the trial court found that the agent's statements were actually false and no error resulted from their admission. The supreme court cautioned that jury instructions and redaction were necessary to avoid undue prejudice:

> Applying these rules to the instant case, we hold that the tape recordings and compared transcripts are admissible and may be presented in evidence by any witness who was present during their recording or who monitored the conversations, if he was so situated and circumstanced that he was in a position to identify the declarant with certainty, and provided his testimony in whole, or in part, comports with other rules of evidence.
>
> In all such cases the jury should be instructed that only the statements, admissions and declarations of the declarant may be considered in the question of guilt or

31

> innocence. Further any statement made by a nontestifying party to the conversation which tends to be prejudicial to the defendant must be redacted, unless admissible under some other rule of law.

Jones, 598 S.W.2d at 223 (emphasis added).

In State v. Bowling, 649 S.W.2d 281 (Tenn. Crim. App. 1983), a panel of our court held that admission of transcripts of the defendant's confession that also contained hearsay by police officers alleging that the defendant had committed other acts of child abuse was erroneous. Id. at 283. In Bowling, this court ruled that the "irrelevant and prejudicial comments and questions should have been redacted because they were denied by [the defendant], not included in the indictment, and not established in any manner by the State's evidence." Id. This court found the error to be harmless because of the defendant's confession and the other proof presented by the state:

> We do not condone in any fashion the manner in which the defendant's confession was admitted into evidence. If the case against him had not been made out so positively by his own confession and the testimony of other witnesses, we think admission of his unredacted interview with the police officer, riddled with hearsay and innuendos ... would warrant reversal.

Id. at 284 (emphasis added).

By the use of the standard established in Jones, a curative instruction would have been warranted in this case. In our view, the following types of comments made by police officers during the interview of the defendant should have been redacted:

> Officer 1: The second incident his fingers. He's handcuffed. I want you to look at that finger right there. That's going to be his right hand. All four fingers of that hand is ground off. Okay. Or rubbed off. This didn't happen on the pavement. This didn't happen on the carpet. Where did this happen [be]cause you had to clean this off. This happened in your apartment? He was

grabbing the chink in between the walls?

Defendant: No he couldn't have. We were in the middle of the floor.

Officer 1: Where did this happen on his fingers? Where did you clean this mess up at in your apartment? He did do this on carpet. This is not the best photo that we've got but this stuff is gone. [Officer 2], this isn't, this isn't, this isn't worn rub on a carpet.

Officer 2: Ends of his finger is gone.

Officer 1: This is meats missing.

Defendant: I don't know, I really don't. I mean, I didn't, I didn't clean anything up upstairs, I didn't....

***

Officer 1: Was there any oral sex?

Defendant: [no]

Officer 1: There was no oral sex between the two of you at all?

Defendant: [no]

Officer 1: There was just an[a]l sex. Are you not into the oral sex?

Defendant: No, no, no....

***

Officer 1: Now, I, I am just totally wanting to know what happened on these fingers. You put him, wait, we'll get back to those. When did you realize that he was dead. He's kicking, he's squirming, he's fighting, he's grunting and all of a sudden it stops. Now it's going to get slower. It's gonna take less than five seconds for him to die or for him to pass out where he's not struggling anymore. Ten, fifteen tops.

Defendant: Yeah.

***

Officer 1: And you, now did you roll him down onto the sleeping bag or did you then get the sleeping bag. Now, I'm sure in between there, there's things like, oh, my God what am I going to do and there's some panic times and I know you're not going to say well, five minutes later I put the sleeping bag, got the sleeping bag and put him in it, but so we won't, we won't worry about what you were thinking about in between.

***

Officer 1: You got him out of the upstairs cause you didn't want to look at him? Tired of him lying around.

Defendant: No.

Officer 1: Not making fun now, I'm trying to lighten this up a little bit, we've had a rough night.

***

Officer 1: You wanted to, you wanted to tell somebody maybe not Warren but you wanted to get this off your chest but you didn't have time. You were still in a panic about what you were going to do with him. You got off work at 11:00 P.M.? Where did you go?

Defendant: I went back home.

***

33

> Officer 1: What did you do for Joey anything?
> Defendant: What did I do for him?
> Officer 1: Uh-hum. Okay, you've just put Joey down this embankment and you've covered him up with the sleeping bag. Did you just jump back up that hill and run back to the car and leave? Did you say a prayer?
> Defendant: I [pause] cried from all of this.

These types of comments impermissibly suggest directly to the jury the conclusions made by the investigating officers who did not testify at trial. There is neither a confirmation nor a denial by the defendant to many of the suggestive questions. The compound nature of the officers' statements make the responses particularly difficult to interpret. The better practice would have been to redact the statements, editing the accusations of the police while, at the same time, making a special effort to preserve the nature and content of the defendant's statements, admissions, and declarations.

Some of the factual conclusions reached by the officers, however, were in some form or fashion supported by the defendant's verbal and written statements or circumstances otherwise made known to the jury. The only exceptions are the officer's comments about the injuries to the victim's fingertips, the precise cause of which state experts could not determine, and the length of time it took for the victim to die. In the context of the entire trial, this error, standing alone, would most likely qualify as harmless. See Tenn. R. App. P. 36(b).

While the pretrial statements of the defendant were critical, much of the circumstantial evidence tended to discredit the veracity of the defendant and tended to corroborate the state's theory of guilt. The circumstances of the killing presented a difficult proposition for a rational, dispassionate resolution of the issues. Neither the accusatory remarks of the officers nor the implications of condemnation fairly substituted for actual statements of the accused.

34

**C. Allowing the Tape-recorded Statement to go to Jury Room**

The defendant contends that, because Rule 30.01 of the Tennessee Rules of Criminal Procedure provides that depositions may not be sent to the jury room during deliberation, the trial court erred by sending the audio-tape of his statement along with other trial exhibits. He argues that the tape-recorded statement is "just like a deposition" and that he was unduly prejudiced by its submission to the jury.

The rule states that "[u]pon retiring to consider its verdict, the jury shall take to the jury room <u>all exhibits and writings which have been received in evidence</u>, <u>except depositions</u>, for their examination during deliberations, unless the Court, for good cause, determines that an exhibit should not be taken to the jury room." Tenn. R. Crim. P. 30.1 (emphasis added). The accompanying comments state that this rule is mandatory in criminal cases and that a judge must send with the jury all exhibits unless the judge determines that there is good cause for excluding them. Tenn. R. Crim. P. 30, advisory commission comments. Therefore, absent a finding of good cause, the rule clearly contemplates that a trial court will send <u>all</u> exhibits and writings except depositions to the jury room during deliberations.

We are not convinced by the defendant's contention that a tape-recorded statement is the equivalent of a deposition for the purposes of this rule. Depositions are transcripts of sworn testimony given with the assistance of counsel and in the presence of a court reporter. When a deposition is entered into evidence, it becomes part of the body of testimony as though it had been presented at trial. If the deposition were taken to the jury room during deliberations, a danger exists that the jury might place too great an emphasis on this one portion of the testimony. A tape-recorded statement is more akin to a videotape of a crime scene. The rule requires its presence

in the jury room during deliberation unless the trial judge has good cause for excluding it.

Nonetheless, the defendant has, for the reasons stated herein, demonstrated that good cause exists. The advisory committee proposed three reasons under Rule 30.1 which might qualify as good grounds for the exclusion of an exhibit:

> 1. The exhibit may endanger the health and safety of the jurors;[11]
>
> 2. The exhibit may be subjected to improper use by the jury; or
>
> 3. A party may be unduly prejudiced by the exhibit's submission.

Id. As indicated, the unredacted audiotape contained several accusations by the police. The compound nature of many of the questions precluded unambiguous responses. The tape qualifies as prejudicial. Absent any other error in the record, the error may have been harmless.

## IV. Expert Testimony

Dr. Charles Harlan, the state medical examiner, conducted the autopsy. The defendant complains that much of the doctor's testimony was based on speculation and conjecture and should have been excluded because the doctor failed to give his opinion based upon a reasonable degree of medical certainty or probability. The defendant also contends that the trial court erred in allowing Dr. Harlan to respond to a hypothetical question proposed by the prosecutor and by refusing to allow his answer to a hypothetical proposed by defense counsel. We first consider the general standards applicable to the admission of expert testimony in Tennessee.

---

[11] We note that the trial judge declined to send the blood-stained sleeping bag because it might be a hazard to the jurors' health.

## A. Admissibility of Expert Testimony

The specific rules of evidence that govern the issue of admissibility of scientific proof in Tennessee are Tennessee Rules of Evidence 702 and 703 that state:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702.

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703.

The Tennessee Supreme Court has recently considered the standard for determining the admissibility of scientific evidence in two recent cases. See State v. Shuck, 953 S.W.2d 662 (Tenn. 1997), and McDaniel v. CSX Transportation, Inc., 955 S.W.2d 257 (Tenn. 1997). Although the McDaniel court was considering whether Tennessee would adhere to the admissibility standards of Frye v. United States, 293 F.1013 (D.C. Cir. 1923) or adopt the holding in Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S. Ct. 1286 (1993), the analysis in McDaniel is of assistance in resolving the issues before us.

In McDaniel, the supreme court concluded that to determine "the standard of admissibility of scientific evidence requires an analysis of the unique language found in Rules 702 and 703 of the Tennessee Rules of Evidence." McDaniel, 955 S.W.2d at 264. Rule 702, the court noted, requires that the evidence "substantially assist the trier

37

of fact," while the federal rule requires only that the evidence "assist the trier of fact." Id. Therefore, the court concluded that the probative force of expert testimony must be stronger before it is admitted in a Tennessee court than under the federal rules. Id. Similarly, according to Rule 703, a Tennessee court "'shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate a lack of trustworthiness.'" Id. (quoting Tenn. R. Evid. 703). Even if expert testimony tends to provide substantial assistance to the jury, the testimony is admissible only if it is based upon reliable facts or data. Shuck, 953 S.W.2d at 668.

Generally, the admission of expert testimony is largely entrusted to the sound discretion of the trial court. State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993). The trial court's decision may be overturned on appeal upon a showing that the trial court abused its discretion. Id. Our supreme court has concluded that "an appellate court should find an abuse of discretion when it appears that a trial court applied an incorrect legal standard or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." Shuck, 953 S.W.2d at 669 (citing Ballard v. Herzke, 924 S.W.2d 652, 661 (Tenn. 1996)).

With these standards in mind, we have addressed the defendant's issues separately below.

### B. Speculation and Conjecture

The defendant argues that much of the medical examiner's testimony was inadmissible because he was not required to state his opinion based upon "a reasonable degree of medical certainty." Specifically the defendant objects to the following:

> Q:    Were there any other marks, doctor, that in your opinion could have been caused by

38

struggle?

Q: Will that type of mark be consistent with a struggle against that bond?

Q: Sometime prior to death, could that blood alcohol level have been higher?

Q: Based on the autopsy results, the blood alcohol level, would it be possible for Mr. Ladd to have been rendered unconscious from alcohol sometime prior to his death?

We find that the trial court did not abuse its discretion in admitting responses to the first two questions. Responses to the remaining questions should have been excluded.

In both criminal and civil cases, medical doctors have traditionally been asked to give an opinion as to the cause of an illness or injury based on "a reasonable degree of medical certainty." However, the test adopted in Lindsey v. Miami Development Corp., 689 S.W.2d 856 (Tenn. 1985), is more properly stated as requiring proof "that it is more likely than not" that the actions caused the results. 689 S.W.2d at 861. In Kilpatrick v. Bryant, 868 S.W.2d 594 (Tenn. 1993), the Tennessee Supreme Court specifically affirmed the holding of Lindsey which requires a reasonable basis for a conclusion concerning causation. Kilpatrick v. Bryant, 868 S.W.2d at 602. Causation in fact, the court stated, is a matter of probability, not possibility. Id. (citing White v. Methodist Hospital South, 844 S.W.2d 642, 648-49 (Tenn. App. 1992)).[12] Expert testimony that a certain thing is possible is no evidence at all, and speculation by an expert is no more valid than the jury's own speculation as to what is or what is not

---

[12] Both Lindsey and Kilpatrick were medical malpractice cases. However, the same standards have been applied in worker's compensation claims and in cases involving automobile accidents. See e.g., Aetna Casualty & Surety Co. v. Long, 569 S.W.2d 444 (Tenn. 1978)(worker's compensation for exposure to dust); Knoxville Poultry & Egg Co., Inc. v. Robinson, 477 S.W.2d 515 (Tenn. 1972)(worker's compensation for bronchitis); Primm v. Wickes Lumber Co., 845 S.W.2d 768 (Tenn. App. 1992)(motor vehicle accident); John Carl Reel and Melba Reel v. Itzel M. Crawley, No. 03A01-9402-CV-0071 (Tenn. App., Knoxville, Aug. 2, 1994)(see concurrence by J. Susano) (automobile accident).

possible. Lindsey, 689 S.W.2d at 862. Medical testimony indicating that a certain condition is "possible" generally will not satisfy the requirement of Rule 702 that an expert witness' testimony "substantially assist the trier of fact." See Primm v. Wickes Lumber Co., 845 S.W.2d at 770.

In criminal cases, experts have at times testified to the cause of injuries or other conditions "to a reasonable degree of medical certainty."[13] However, nothing in Tennessee law requires that those or any other specific words be recited in order for expert testimony to be admissible. In State v. Coker, 746 S.W.2d 167 (Tenn. 1987), the supreme court upheld a trial court's exclusion of a medical doctor's testimony as it fell short of the degree of medical certainty necessary for admissibility required in Lindsey. Coker, 746 S.W.2d at 174 (citing Lindsey v. Miami Development Corp., 689 S.W.2d 856, 862 (Tenn. 1985)). The true test in Lindsey is whether the given conduct or circumstances more likely than not caused the injury, condition or other result. Kilpatrick v. Bryant, 868 S.W.2d at 602; see also State v. Mark Fortson, No. 268, slip op. at 10 (Tenn. Crim. App., Knoxville, Feb. 2, 1990).

Under the Rules of Evidence, the question is when is the medical testimony so speculative that it is no longer of substantial assistance to the jury or is in danger of being misleading or confusing. Tenn. R. Evid. 403, 702, 703. The supreme court has applied the same standard in criminal cases as in civil cases. See Coker, 746 S.W.2d at 174. We must determine, therefore, whether Dr. Harlan's responses were sufficiently certain so that they could provide substantial assistance to the jury in resolving a disputed question of fact or in understanding the evidence. See Primm v.

---

[13] State v. Maruja Paquita Coleman, No. 01C01-9401-CR-00029 (Tenn. Crim. App., Nashville, July 31, 1997)(cause of death); Donna Bailey and Darrell Eugene Helton v. State, No. 03C01-9207-CR-00226 (Tenn. Crim. App., Knoxville, Nov. 22, 1993)(cigarette burns); State v. James P. Anderson, No. 22 (Tenn. Crim. App., Knoxville, Nov. 9, 1990)(enlarged vaginal orifice).

<u>Wickes Lumber Co</u>., 845 S.W.2d 768, 770-772.

With respect to those questions in which the prosecutor asked whether there were any other marks that could have been caused by a struggle and whether a type of mark was consistent with a struggle against a bond, we find the doctor's responses were both sufficiently certain and of substantial assistance to the jury. Although the prosecutor used the words "could have been," the doctor's responses were clear and unequivocal. He described the various wounds in detail and responded affirmatively that the marks found around the wrists and ankles were consistent with a struggle against a bond. The testimony was relevant to the issues of intent, consent, and other questions of material fact. The testimony was not so speculative that it was not of substantial assistance to the jury. Although the doctor did not specifically state that it was more likely than not that the wounds were the result of a struggle, we cannot say that the trial court applied an incorrect legal standard or reached a decision which is against logic or used reasoning that caused an injustice to the defendant. <u>Melvin Eugene Shuck</u>, slip op. at 16 (citing <u>Ballard v. Herzke</u>, 924 S.W.2d 652, 661 (Tenn. 1996)).

The medical examiner's responses to the two questions concerning the victim's blood alcohol level are more problematic. In the first, the prosecutor asked, "Sometime prior to death, could that blood alcohol level have been higher?" The doctor responded, "It might have been." In the second, the prosecutor asked, "Based on the autopsy results, the blood alcohol level, would it be possible for Mr. Ladd to have been rendered unconscious from alcohol sometime prior to his death?" The response was, "If he had, prior to his time of death, at any time reached an alcohol level of .21 or greater, as I previously testified, then he would be subject to nausea, vomiting, and a comatose state or passing out."

41

First, the state's questions lacked certainty as to the time frame covered. Although the context of the case implies that the prosecutor is speaking of the night in question, "sometime" is usually insufficient to limit the expert's consideration to any specific occasion. Second, a mere possibility, without more, is insufficient to qualify as an admissible expert opinion. <u>Lindsey</u>, 689 S.W.2d at 852. In this instance, the prosecutor's questions invited speculation, and the expert's responses, not surprisingly, were indefinite and vague. Evidence that merely makes it possible for a fact in issue to be alleged or which raises a mere conjecture or suspicion is an insufficient foundation upon which to base a verdict. <u>Fine v. State</u>, 193 Tenn. 422, 428-429, 246 S.W.2d 70, 72 (Tenn. 1952). Such testimony cannot provide substantial assistance to the jury and should not be admitted into evidence. The admission of such evidence is contrary to the reasoning and logic of Rules 702 and 703. Standing alone, however, these errors may have been harmless.

## C. Hypothetical Questions

The defendant contends that the trial court improperly allowed the state to ask a hypothetical question that assumed facts that were not in evidence and that the trial court also erred in refusing to allow the defense to ask a hypothetical concerning the effect of alcohol on the deceased and the defendant. We find that neither question was a proper hypothetical question, and that Dr. Harlan's responses should have been excluded in both instances.

It has long been the law in Tennessee that it is not proper for hypothetical questions to assume facts that are not supported by the evidence. Pentecost v. Anchor Wire Corp., 662 S.W.2d 327, 328 (Tenn. 1983); Bailey v. State, 479 S.W.2d 829, 835 (Tenn. Crim. App. 1972); Moon v. Johnson, 47 Tenn. App. 208, 222, 337 S.W.2d 464, 470 (1959); Griffin v. State, 578 S.W.2d 654, 658 (Tenn. Crim. App. 1978); Nix v. State, 530 S.W.2d 524, 530 (Tenn. Crim. App. 1975). An appellate court, however, is not required to search the entire record to determine whether every possible fact is listed in the question or whether every hypothetical fact is supported by the evidence presented by the opposing party. Pentecost v. Anchor Wire Corp., 662 S.W.2d at 328-329. The issue is resolved "by determining whether the question contained enough facts, supported by evidence, to permit an expert to give a reasonable opinion which is not based on mere speculation or conjecture and which is not misleading to the trier of fact." Id. at 329.

Tennessee's traditional rule is not inconsistent with the requirements of the Tennessee Rules of Evidence. Neil P. Cohen, et al., Tennessee Law of Evidence, § 705.1, at 477 (3rd Ed. 1995). Although Rule 705 abolishes the requirement of using a hypothetical question, the rule does not disallow them. Tenn. R. Evid. 705, advisory commission comments. Rule 703 allows an expert to base an opinion on facts not in

evidence if they are of a "type reasonably relied upon by experts in the particular field" and are trustworthy. Tenn. R. Evid. 703. A trial court may disallow opinions and inferences if the underlying facts or data are untrustworthy, incomplete, or misleading. Cohen, Tennessee Law of Evidence, § 705.1 at 477. Of course, an expert's response to a hypothetical question "must substantially assist the trier of fact to understand the evidence or to determine a fact in issue. . ." Tenn. R. Evid. 702. A question based on untrustworthy or incomplete data or that is misleading will not be of any assistance to the trier of fact.

In this case, two hypothetical questions were proposed, one by the state and one by the defense. The trial court allowed the former and disallowed the latter. After Doctor Harlan had testified to the rate at which alcohol metabolizes in the human body, the prosecutor asked the following question:

> Just hypothetically, then, Doctor, say a period of five hours passes from the time that a person quits drinking till the time they die and you receive a result like you did in this case, based on that, a person weighing approximately 200 pounds, could you estimate what their blood alcohol content would have been at the point of equilibrium after they quit drinking?

Defense counsel objected that there were not enough facts in the hypothetical.[14] The trial court overruled his objection, and Dr. Harlan was allowed to testify that a person whose blood alcohol level at death was .19 and who stopped drinking five hours prior to death would have a attained a blood alcohol level of .265 grams after consuming the last drink.

The state's hypothetical question is based on three facts: (1) that the

---

[14] In his objection, defense counsel noted that the hypothetical did not include information about the kind of liquor being consumed but made no mention of the time when the last drink was consumed. The state did not raise the issue of waiver, and we have decided to address the issue on its merits in the interests of justice. Tenn. R. App. P. 2.

44

person quit drinking five hours prior to death, (2) that at death the person's blood alcohol level was .19 grams, and (3) that the person in question weighed approximately 200 pounds. The victim's weight and his blood alcohol level are included in the autopsy records and no one questions their trustworthiness. Dr. Harlan testified to the metabolization rate of alcohol, a fact usually relied upon by experts in the field. However, the fact that this hypothetical person quit drinking five hours prior to his death is unsupported by the record. The defendant testified that the two men continued to drink throughout the night. Nothing contradicts this statement. Moreover, the record does not clearly establish the time of death. We must determine whether the question contained enough facts, supported by evidence, to permit Dr. Harlan to give a reasonable opinion which was not based on mere speculation and which would be of "substantial assistance to the trier of fact." Id. at 329.

This court has previously held that a trial court erred in allowing an expert to answer a similar question when a vital factual component was not supported by the evidence. Griffin, 578 S.W.2d at 658-659. In Griffin, the state asked an expert witness to relate the minimum number of beers persons weighing 115 pounds and 160 pounds respectively would require before reaching a specific blood alcohol level. The weight of the defendants, however, was never placed in evidence, and this court held that the expert's response was inadmissible. Id.

In this instance, a necessary fact to the resolution of a hypothetical question was unsupported by the evidence. To answer the question, Dr. Harlan was required to speculate both as to the time the last drink was taken and the time of death. It is unlikely that the answer to such a hypothetical question would assist the jury in understanding the evidence or in resolving any disputed factual issues. While the trial court might have erred in permitting the doctor to respond, this error would not have

45

warranted a reversal. The gravamen of Dr. Harlan's testimony, in this regard, was to establish the rate at which the victim was able to metabolize the alcohol.

During cross examination, Dr. Harlan testified that intoxication reduces one's judgment, alters the ability to perceive changes in the environment, and increases the time to react. Defense counsel then proposed the following question:

> So it's entirely possible, isn't it, Doctor, that if in this case we have two intoxicated men performing or engaging in bondage sex, it's entirely possible for the one who is not in bondage at a given point in time not to appreciate the discomfort of his sexual partner since he is intoxicated.

The state objected because the doctor lacked "the information to base that conclusion on." When defense counsel conceded that "the information" was not yet in the record but would come in later, the trial court sustained the objection. We cannot say that the trial court abused its discretion in refusing to allow the doctor to respond. Although the jury would ultimately hear the defendant's statement concerning bondage sex, nothing concerning the defendant's degree of intoxication would ever be placed in evidence. The defendant did not have a blood test during the early morning hours when Joey Ladd died, and his level of intoxication is a matter of speculation and conjecture. The trial court did not err in sustaining the state's objection.

## V.  Lay Witness Testimony

Over the defendant's objection, the trial court allowed one of the investigating officers to give his impression of the defendant's demeanor during the interview and to express his opinion as to the nature of the stains on the sleeping bag. The defendant now argues that the admission of this testimony denied him a fair trial. After carefully reviewing the record and the applicable law, we conclude that some of Warf's responses were improperly admitted.

Opinion testimony is generally limited to witnesses who qualify as experts in the subject matter of their respective testimony. Tenn. R. Evid. 702. Lay witnesses may express opinions when certain prerequisites are established. Tenn. R. Evid. 701. This rule, as adopted on January 1, 1990, essentially incorporated existing Tennessee law. State v. Sparks, 891 S.W.2d 607, 613 (Tenn. 1995). Ordinarily, in order to preserve the fact-finding function of the jury, a witness should state the evidentiary facts and allow the jury to draw such conclusions as the facts warrant. Blackburn v. Murphy, 737 S.W.2d 529, 532 (Tenn. 1987). When lay opinion is admissible, Tennessee law traditionally has required that an opinion be based upon a factual predicate found in facts admissible in evidence. Sparks, 891 S.W.2d at 613.

> As the Advisory Commission to the Tennessee Rules of Evidence notes,
>
> The rule rather specifically circumscribes the area where a lay witness can testify to opinions as opposed to facts. The Commission believed that the instances would be rare where a witness could not convey thoughts to the jury by enumerating facts, leaving it to the jurors to draw inferences.

Tenn. R. Evid. 701, advisory commission comments. Before a lay witness may express an opinion or an inference, the party presenting the witness must establish:

> (1) The witness has "personal knowledge" of the facts or subject matter that forms the basis for the opinion or inference, Tenn. R. Evid. 602;
>
> (2) The opinion or inference does not require a special knowledge, skills or training, Tenn. R. Evid. 701(a)(1);
>
> (3) The witness cannot readily and with equal accuracy and adequacy communicate what the witness has perceived to the trier of fact without testifying in terms of opinions or inferences, Tenn. R. Evid. 701(a)(2);
>
> (4) The opinions or inferences expressed by the witness will not mislead the trier of fact to the prejudice of the adverse party. Tenn. R. Evid. 701(a)(3).

See Sparks, 891 S.W.2d at 613; State v. Catherine Ward, No. 01C01-9307-CC-00224, slip op. at 19 (Tenn. Crim. App., Nashville, Feb. 2, 1996).

Detective Warf testified that the stains on the sleeping bag appeared to be blood or other bodily fluids. Such a characterization may be proper if there is no other way to state such an observation clearly. State v. Brown, 836 S.W.2d 530, 550 (Tenn. 1992). The state relies upon State v. Mabon, 648 S.W.2d 271, 274 (Tenn. Crim. App. 1982) and Schweizer v. State, 399 S.W.2d 743, 745 (Tenn. 1966), to justify the admission of the detective's opinion. In Mabon, however, the officer testified that he observed what appeared to be blood on a door and on a walkway immediately after a crime was committed, Mabon, 648 S.W.2d at 274, and the officer in Schweizer reported that he noticed what appeared to be blood under the defendant's right arm shortly after the defendant's arrest. Schweizer, 399 S.W.2d at 745. In the present case, the prosecutor handed Detective Warf the sleeping bag and asked him what those stains appeared to be.[15] When the defense objected, the prosecutor replied that Warf had nine years of experience as a police officer, and "in addition to that, that's just something that is within everyone's common experience."

We agree with the prosecutor's statement that almost everyone is familiar with the appearance of blood stains. Therefore, the members of the jury were as qualified as Detective Warf to determine the possible origin of a stain that appeared on a tangible object that was admitted into evidence and that was viewed by the entire jury. Although it may have been necessary for the officers in Mabon and Schweizer to characterize what they had seen as "blood" because the jury could not see the stains, such a characterization was not required in this case. Detective Warf's opinion regarding the source of the stains on the sleeping bag should not have been admitted. This error would not warrant a new trial. The jurors could have easily reached the same conclusions as Detective Warf.

---

[15]    The prosecutor also asked the detective to look at a photograph of the victim's head, and the detective testified that the marks appeared to be dried blood. The defendant has not raised any issue regarding this particular response.

The detective's comments regarding the defendant's demeanor during questioning present a closer question. During redirect examination, Detective Warf testified that sometimes the defendant became "vague," that he "acted as though he didn't want to tell us everything," and that "it seemed he didn't want to answer a question." In a case decided prior to the adoption of the Tennessee Rules of Evidence, a defendant's statement was read aloud at trial. State v. Johnson, 743 S.W.2d 154, 158 (Tenn. 1987). The defendant's attorney was present when the statement was taken, and twice during the reading, the police officer referred to his notes and testified that the appellant appeared to be nervous and asked to confer with his attorney prior to answering the question. Id. Our supreme court held that "[g]enerally where the answers to questions are admissible, the demeanor and behavior of the person giving the statement may be commented upon by witnesses who were present." Id. In a more recent case, however, the supreme court held that under Rule 701 a police officer's statements that the defendant knew the wrongfulness of his conduct and could conform his conduct to the law were not admissible. Sparks, 891 S.W.2d at 614. The court found that the officer had only a very limited opportunity to observe the defendant, and since the observations on which the officer based his conclusions were adequately communicated to the jury in other evidence, the detective was in no better position to draw a conclusion than were the members of the jury. Id. In addition the court noted with approval the Advisory Committee's note to Federal Rule of Evidence 701 that "assertions which amount to little more than choosing up sides, should be excluded as unhelpful to the jury." Id.

Detective Warf's comments were unnecessary to the extent that he drew conclusions from the hesitations and ramblings of the defendant's responses. Warf testified that "it seemed like he didn't want to tell us," that "he didn't want to answer a question," and that "his response would become vague or he would jump to another

issue." These comments should have been disallowed. The detective, however, was present at the interview and was able to see the defendant's facial expression, body movements, and posture. If the prosecutor had asked the detective to describe those reactions, descriptions of the defendant's demeanor may well have assisted the jury in determining the weight and credibility of the defendant's statements. While some of the detective's remarks were neither descriptive nor concerned with the defendant's demeanor,[16] that the defendant "appeared calm" is admissible as reflective as demeanor. The supervision of this kind of testimony is largely discretionary with the trial court. The testimony that should have been excluded might have had minimal impact on the jury. The subject matter does relate to the question of redaction, which has been previously addressed. Thus, the failure to redact was exacerbated by some of Detective Warf's testimony.

### VI. Admissibility of Crime Scene Videotape and Photographs

The defendant next contends that the trial court erred in admitting into evidence a videotape showing the victim's body at the site where it was found, various photographs showing injuries the victim suffered, and a single photograph of the contents of the defendant's refrigerator. He alleges that the video tape and photographs were of little or no probative value and, therefore, should have been excluded because their probative value is substantially outweighed by their prejudicial effect.

Photographs and videotapes of the victim of a homicide are generally admissible in murder prosecutions if they are relevant to issues on trial. Our supreme court has held that the "admissibility of photographs lies within the discretion of the trial

---

[16] "Demeanor" is defined as behavior toward others, outward manner, and conduct, or bearing, mien, and facial appearance. Webster's Third New International Dictionary 599 (1993).

court whose ruling . . . will not be overturned on appeal except upon a clear showing of an abuse of discretion." State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). In Banks, the court listed the following factors that trial courts should consider in determining the admissibility of photographs of murder victims: (1) the accuracy and clarity of the photographs and their value as evidence; (2) whether the photographs were taken before the body was moved, if the position and location is material; (3) the adequacy of testimonial evidence in relating facts to the jury; and, (4) the need for the evidence to establish a prima facie case or to rebut the defendant's contentions. Banks, 564 S.W.2d at 951. The modern trend vests great discretion in a trial court's ruling on the admissibility of photographs. Id. Photographic evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice or confusion of the issues or if the evidence would mislead the jury or is needlessly cumulative. State v. Bates, 804 S.W.2d 868, 878-79 (Tenn. 1991); Tenn. R. Evid. 403.

In this case, neither the photographs of the body nor the videotape were gruesome or horrifying. The videotape contains no police commentary and shows the scene where the body was found and its condition. The photographs of the body show the bruising around the victim's wrists and ankles, the damage to his fingertips, and a shallow gash in his head.[17] This information is relevant to the material issues of premeditation, intent, and consent. Although the photographs may have been somewhat cumulative to other testimony we cannot say that they are needlessly cumulative, that they misled the jury, or that they were unfairly prejudicial to the

---

[17] We recognize that some of the photographs were taken in the morgue after the body had been moved and that this weighs against their admissibility. See Banks, 564 S.W.2d at 951; State v. LeRoy Hall, No. 03C01-9303-CR-00065, slip op. at 26 (Tenn. Crim. App., Knoxville, Dec. 30, 1996). In this instance, however, the photographs were taken prior to the autopsy, and the victim had not undergone any treatment that might have changed the appearance of the injuries. The nature of the injuries was especially probative of lack of consent and the severity of the acts of the defendant.

defendant. Tenn. R. Evid. 403. The trial court did not err in admitting either the videotape or the photographs of the body.

The picture of the contents of the defendant's refrigerator, however, should have been excluded. The photograph shows the bottom shelf of a refrigerator which held three bottles and five cans of beer, a green bottle which was identified at trial as Jagermeister, a large container of Coca Cola, and two other bottles which may contain fruit juice. The officer testified that he took the picture one week after the homicide occurred. The state has not demonstrated that the contents of the defendant's refrigerator seven days after the victim's death by strangulation has any relevance to the issues in this case. The photograph could contribute no information about events that occurred a week earlier and should not have been admitted. Admission of the photograph was error.

## VII. Testimony of James Andrew Starnes

### A. "Lifestyle" Evidence

When the state called James Andrew Starnes, the defendant's close friend, to testify at trial, the following occurred on direct examination:

> Q.    In addition to yourself, would you see other people over at his apartment that you knew?
>
> A:    People from work, yes, sir, sometimes, not always.
>
> Q.    Other than you and the people at work, did you see any other persons over at Mr. Young's apartment when you were there?

At this point, defense counsel objected. When the trial court excused the jury, the prosecutor stated as follows:

> I am seeking to elicit testimony that other people that worked with him were over there.
>
> I am also seeking to elicit testimony that all of the people that went over there, like the alleged victim in this

case, were some ten to 12 to 15 years younger. And through Mr. Waldron's cross-examination of the previous witness, he brought out that Mr. Young was concerned about the drinking habits of the alleged victim in this case, thought he needed to be counseled, but I want to show through this witness that he as well as others went over there on a regular basis at Mr. Young's apartment and drank alcohol, and that this was a similar situation to what the victim in this case found himself in, and that this alleged counseling or getting him over there to counsel him about his partying was just a ploy to get him over to the apartment and to make his acquaintance.

And I think it is relevant to show that this was not an isolated event in the lifestyle that Mr. Young led.

Defense counsel argued that the testimony concerned prior bad acts and was inadmissible under Rule 404(b). The trial judge responded that he did not view it as a prior bad act. Defense counsel then responded that, in any event, the testimony was irrelevant, and if it were marginally relevant to any issue in the case, the jury could draw some highly prejudicial inferences from such testimony. The trial court overruled the objection. The prosecutor then continued:

Q. Now, Mr. Starnes, back to the fall of 1994, I believe you testified that you had occasion to go over to Mr. Young's apartment at least twice a week?

A: Yes, sir.

Q: Would that be a fair statement?

A: Yes, sir.

Q: Would that be after work?

A: I worked from 6:00 a.m. to 2:00 p.m., so not usually right after work.

Q: Tell us the time of day that usually you would go over to Mr. Young's apartment.

A: Like 7:00 o'clock or something.

Q: And when you went over to Mr. Young's apartment, other than you and Mr. Young, did you see other people over there that you knew?

53

A: Occasionally, people from work.

Q: And did you see anybody else over there that you didn't know?

A: No, sir.

Q: Now what would you do when you were over at Mr. Young's apartment back in the fall of 1994.

A: Watch movies and drink beer.

Later the prosecutor continued:

Q: Now, Mr. Starnes, not to embarrass you, but did you ever get drunk over at Mr. Young's, drink to that point?

A: Yes, sir.

Q: Did you ever see Mr. Young drink to the point that he was intoxicated?

A: Yes, sir.

The defendant contends that this testimony was elicited in violation of Rule 404(b) of the Tennessee Rules of Evidence. The state argues that Starnes's testimony is evidence of habit and admissible under Tennessee Rules of Evidence 406. We disagree. As discussed below, Starnes's testimony clearly is not evidence of habit, and Starnes's responses regarding the defendant's lifestyle propensities should have been excluded under Rules 403 and 404(b).

Rule 406, which governs the admissibility of evidence of habit or routine practices, provides in part:

(a) Evidence of the habit of a person, an animal or of the routine practice if an organization . . . is relevant to prove the conduct of the person, animal, or organization on a particular occasion was in conformity with the habit or routine practice.

(b) A habit is a regular response to a repeated specific situation. A routine practice is a regular course of conduct

54

of an organization.

Tenn. R. Evid. 406.  Tennessee courts recognize the dangers of such evidence and generally do not look on it with favor.  Bridges v. CSX Transportation, Inc., 845 S.W.2d 760, 765 (Tenn. App. 1992).  To be admissible, its relevancy and probative value must clearly appear.  Id. (citations to other sources omitted).  Habit or custom is not probative unless the action is of sufficient regularity to make it probable it would occur in almost every instance.  Cable v. Russell, 2 Tenn. Crim. App. 363, 369, 454 S.W.2d 163, 166 (1969).

Nothing in Starnes's testimony indicates that the actions he described occurred with sufficient regularity to be considered habitual activity that would occur in every instance or even in most instances.  Such testimony was not admissible under Rule 406.  Of course, even if such "habit" evidence had been established, its relevance to any material issue in the case is doubtful.

Rule 404 governs the admissibility of character evidence.  Although there are exceptions, the rule is one of exclusion.  State v. Bordis, 905 S.W.2d 214, 227 (Tenn. Crim. App. 1995); Tenn. R. Evid. 404(a).[18]  Although usually applied to other crimes, wrongful acts, or misconduct, the language of the rule does not require that the

---

[18]     The rule provides:
> (a) Character Evidence Generally.
> Evidence of a person's character or a trait
> of character is not admissible for the
> purpose of proving action in conformity with
> the character or trait on a particular
> occasion, except:
>
> (1) **Character of Accused**.
> Evidence of a pertinent character trait
> offered by the accused or by the
> prosecution to rebut the same.

Tenn. R. Evid. 404(a)(1).

55

acts covered by the rule be either criminal or wrongful. It states that "[e]vidence of other crimes, wrongs, or <u>acts</u> is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b) (emphasis added). According to the clear language of the rule, evidence of an act that may be neither criminal nor overtly wrongful is still subject to the requirements of Rule 404(b) if the state introduces the evidence to prove that a defendant acted in conformity with a given character trait.[19] See <u>Woodson v. Porter Brown</u>, 916 S.W.2d 896, 908 (Tenn. 1996)(evidence relating to carefulness excluded); <u>State v. Christopher David Wilson</u>, No. 02C01-9502-CC-00045, slip op. at 18 (Tenn. Crim. App., Jackson, Dec. 1, 1997) (rule 404(b) not limited to other crime evidence). The rule excluding such evidence is based on the recognition that the evidence may lead a jury to convict a defendant for an apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial. <u>Bordis</u>, 905 S.W.2d at 232; <u>State v. Tizzard</u>, 897 S.W.2d 732, 743-44 (Tenn. Crim. App. 1994). In those instances where the conduct or acts are similar to the crimes on trial, the potential for such a result increases. <u>Bordis</u>, 905 S.W.2d at 232.

Lifestyle evidence is character evidence subject to Rule 404(b). <u>Id</u>. The defendant's character was not an issue in this case. The defendant made no attempt to deny that he was a homosexual or that he used alcohol. Although evidence of a prior act is not admissible to prove propensity or disposition to commit a crime, it may arguably be relevant to issues such as identity, intent, motive, or rebuttal of accident or mistake. <u>State v. Parton</u>, 694 S.W.2d 299, 303 (Tenn. 1985); Tenn. R. Evid. 404,

---

[19]    Similarly, Rule 405 does not apply solely to negative character traits nor to specific incidents of wrongful conduct. The rule refers to "evidence of character or a trait of character," Tenn. R. Evid. 405(a), and to "specific instances of that person's conduct." Tenn. R. Evid. 405(b).

advisory commission comments.[20]   Therefore, unless the evidence is relevant to a material issue such as intent or motive, the testimony should have been excluded.

We find nothing in Starnes's testimony that is relevant to establishing an intent, motive or any other relevant fact.  Intent and motive should not be confused with propensity.   Parton, 694 S.W.2d at 303.   Nor should evidence of what may be perceived as an unwholesome lifestyle be allowed to cloud the issues that are before the jury.  Bordis, 905 S.W.2d at 214.   In State v. Rickman, 876 S.W.2d 824, (Tenn. 1994), our supreme court quoted the Delaware Supreme Court with approval:

> We are no more inclined to endorse [the assumption that a defendant's propensity for satisfying sexual needs is so unique that it is relevant to his guilt] than we are to consider previous crimes of theft as demonstrating a larcenous disposition and thus admissible to show proof of intent to commit theft on a given occasion.

Rickman, 876 S.W.2d at 829 (quoting Getz v. State, 538 A.2d 726, 734 (Del. 1988)). In addition, the evidence in question is not  relevant to rebutting the defense of accident.  Although the defendant argued that the death of the victim was accidental, evidence concerning the defendant's social activities does not speak to that issue.

Even if the testimony had some minimal relevance to an issue that was before the jury, Rule 404(b) would require the trial court to exclude the evidence as its insignificant probative value is outweighed by the danger of unfair prejudice.  Tenn. R. Evid. 404(b)(3).  The 404(b) balancing test differs from that in Rule 403 which calls for the exclusion of relevant evidence if the probative value is substantially outweighed by

---

[20]      The rule also requires the trial judge to hold a jury-out hearing, if requested, and, prior to admitting the evidence, to identify the specific material, disputed issue for which the evidence is being admitted.  Tenn. R. Evid. 404(b)(1), (2).  In addition the trial judge must find that the probative value of the evidence is not outweighed by any danger of unfair prejudice.  Tenn. R. Evid. 404(b)(3).  Obviously the trial judge did not make the requisite findings in this instance because he believed that the rule was inapplicable if the prior acts were not "bad."

the danger of unfair prejudice. Tenn. R. Evid. 403. Even under Rule 403, the testimony should have been excluded because of its minimal probative value.

## B. Failure to Comply with Rule 26.2

The defendant also contends that the trial court should have stricken from the record Starnes's testimony quoting the defendant because the state failed to comply with Rule 26.2 of the Tennessee Rules of Criminal Procedure. The rule provides that after a witness has testified, the court shall, on motion, direct the party calling the witness to produce any statement of the witness in that party's possession. Tenn. R. Crim. P. 26.2(a) (emphasis added). Although the Tennessee Supreme Court has strongly recommended that such statements be provided before trial in order to expedite trials and avoid lengthy recesses, State v. Caughron, 855 S.W.2d 526, 535 (Tenn. 1993), nothing in the rule requires that either party provide a witness statement prior to trial. Moreover, the record in this case indicates that the witness arrived in Murfreesboro the day before he testified. Although the prosecutor admitted that a statement existed, it could not have been produced much earlier.

Rule 26.2(a) allows a defendant to move for the production of any witness's statement in the state's possession after the witness has testified. If the defense requests a recess in order to review the statement, the trial court may grant the request to allow the defense a reasonable opportunity to study the statement and to prepare for cross-examination. Caughron, 855 S.W.2d at 535; Tenn. R. Crim. P. 26.2(d). The defense never moved for the production of the statement. Instead, counsel moved to strike Starnes's testimony. Striking the testimony was neither necessary nor appropriate under the Rules of Criminal Procedure, and the trial court did not err in denying that request. See Tenn. R. Crim. P. 26.2.

## VIII. Comments by the Trial Court

During the cross-examination of Detective Warf, the defense attempted to impeach the witness by using his testimony given at the preliminary hearing. Defense counsel referred to a specific page and line in the transcript. After obtaining a response from the witness, defense counsel began to move on to the next question. The trial judge turned to the prosecutor and asked, "General, is there any other potion of that page you want read to put this in context?" The General declined, stating that he would cover it on redirect. The defense contends that the trial court's comment implied that defense counsel was attempting to conceal information or to mislead the jury. We respectfully disagree.

Obviously a trial judge should take care not to express any thought that might lead the jury to infer that the judge is in favor of or against the defendant in a criminal case. Caughron, 855 S.W.2d at 536 (citing Brooks v. State, 187 Tenn. 67, 74, 213 S.W.2d 7, 10 (Tenn. 1948)). If the interjections and comments of a trial judge clearly violate the mandate of impartiality, they may infringe upon a defendant's right to a fair trial. Caughron, 855 S.W.2d at 536-537; State v. Jerry Douglas Franklin, No. 01C01-9510-CR-00346, slip op. at 27-28 (Tenn. Crim. App., Nashville, Feb. 28, 1997).

In this case, however, the trial court's interjection was not a comment on the evidence. As the trial judge explained when ruling on the motion for new trial, he asked the question for the purpose of complying with Tennessee Rule of Evidence 106 which allows a party to read into the record any other portion of a writing or recorded statement that should be considered contemporaneously with the segment introduced by an adverse party.[21]

---

[21] The defendant's failure to make a contemporaneous objection to the court's question has waived this issue. Tenn. R. App. P. 36(a). However, we have chosen to consider the issue on its merits. We note that, if a timely objection had been

made,  the trial court could have given the jury an immediate curative instruction.

### IX. A Defendant's Right to Plead Guilty

After the state rested, the trial court granted the defendant's motion for judgment of acquittal for premeditated and deliberate murder. The court agreed with the state that Count I of the indictment was now a charge of second-degree murder. The next morning, the defense rested without putting on any proof. After the judge instructed the jury, defense counsel approached the bench and, out of the jury's hearing, told the trial court that the defendant wished to plead guilty to second-degree murder. The state objected on the grounds that the state had not entered into any plea agreement with the defendant. The trial court then refused to allow the defendant to plead guilty.

The defendant now contends that he had the right to plead guilty to the charge of second-degree murder in the amended count of the indictment. The state argues, first, that a defendant has no absolute right to plead guilty and, second, that even if the trial court had accepted his guilty plea, the charge of felony murder in Count 2 would still have gone to the jury. Upon conviction on Count 2, the state reasons, the two convictions would have merged into one conviction for felony murder.

As the state points out, the acceptance of the plea would not have required the dismissal of the charge of felony murder because a plea to a lesser offense does not bar the state from trying the accused for the greater. Parham v. State, 885 S.W.2d 375, 380 (Tenn. Crim. App. 1994). Although the double jeopardy guarantees of the Fifth Amendment to the United States Constitution and Article I, Section 10 of the Tennessee Constitution protect individuals against a second prosecution or multiple punishments for the same offense, double jeopardy concerns are satisfied by either vacating the lesser conviction or merging the lesser into the greater. State v. Hurley, 862 S.W.2d 57, 69-70 (Tenn. 1993); State v. Zirkle, 910

61

S.W.2d 874, 889 (Tenn. Crim. App. 1995); State v. Sledge, No. 02C01-9405-CR-00089, slip op. at 17, 18 (Tenn. Crim. App., Jackson, Nov. 24, 1997); State v. Perry A. Cribbs, No. 02C01-9508-00211, slip op. at 36 (Tenn. Crim. App., Jackson, Feb. 14, 1997).[22] Therefore, even if the trial judge had accepted the defendant's guilty plea, a conviction for felony murder was still possible, and the case would have gone to the jury on the second count of the indictment. The trial court did not abuse its discretion in refusing to accept a futile guilty plea. See Goosby v. State, 917 S.W.2d 700 (Tenn. Crim. App. 1995).

## X. Prosecutorial Misconduct

### A. Improper Comment on Defendant's Failure to Testify

The defendant argues that the prosecutor improperly commented on his failure to testify when he argued that only Mr. Ladd and Mr. Young were present that night, and "we can't hear from Mr. Ladd anymore. We can't get his version." A prosecutor is strictly prohibited from commenting upon a decision made by a defendant not to testify at trial. Griffin v. California, 380 U.S. 609, 85 S. Ct. 1229 (1965); Tenn. Const. Art. I § 9; State v. Shepherd, 862 S.W.2d 557, 572 (Tenn. Crim. App. 1992). The prosecutor, however, did not comment on the defendant's failure to testify. The defendant's statement conveyed to the jury the defendant's version of events. The prosecutor's remark may have questioned the credibility of the defendant's version by pointing out that only one side of the story had been told, but it was not a comment on the defendant's failure to testify.

---

[22] We note that these cases are not in agreement as to those circumstances in which the lesser conviction must be dismissed rather than merged into the greater. For our analysis, it makes no difference. The result of either merger or dismissal of the second-degree conviction would have the same result.

## B. Inflammatory Remarks

The defendant also contends that a number of remarks in the prosecutor's closing argument were improper and calculated to inflame the passions of the jury. As examples of those improper arguments, the defendant cites the following:

1. The defendant was older than his co-workers "that would frequent his apartment on a regular basis to drink and do 'whatever.'"

2. The defendant provided a place to party and to drink in order to fulfill "that closet desire because we have not heard about one young lady that went over to his apartment. We have not heard about any relationship with a female."

3. "Many other young men have gone to Mr. Young's apartment to engage in drinking."

4. "He was in the habit of entertaining the young men he worked with."

5. "You saw a picture of his refrigerator, and you saw what was in it. Beer, liquor, and this stuff. And he was glad to do that because that was a way that he could fulfill part, I submit to you, the proof would show, of his closet homosexuality."

These comments, the defendant argues, are improper comments on the evidence and were intended to elicit the prejudices of the jury against the defendant as a homosexual and to infer that he enticed younger men to his apartment "to drink and do whatever." The state contends that the defendant's failure to make a contemporaneous objection to all but one of these remarks constitutes waiver and that, in any case, the arguments were not improper as they were based on evidence admitted at trial. Defense counsel objected only to the second remark described in the list above. When a party fails to take whatever action is reasonably available to prevent or nullify the harmful effect of an error, this court is not required to grant relief. Tenn. R. App. P. 36(a). However, in the interests of justice, we will consider the defendant's complaints concerning the

63

prosecutor's closing argument in full. Tenn. R. App. P. 2.

Closing arguments are an important tool for both parties during the trial process. State v. Clarence C. Nesbit, No. 02C01-9510-CR-00293, slip op. at 24 (Tenn. Crim. App., Jackson, Apr. 22, 1997). Consequently, attorneys are usually given wide latitude in the scope of their arguments. See State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994). Trial judges are accorded wide discretion in their control of those arguments, see State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995), and a trial court's finding will not be reversed absent an abuse of that discretion. State v. Payton, 782 S.W.2d 490, 496 (Tenn. Crim. App. 1989).

Tennessee law requires that a prosecutor's closing argument "must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried." Sparks v. State, 563 S.W.2d 564, 569 (Tenn. Crim. App. 1978) (quoting from Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976)). In this instance, the district attorney general's remarks were predicated on evidence introduced during trial. The photograph of one shelf in the defendant's refrigerator was in evidence as was the testimony of Mr. Starnes about the occasional gathering of co-workers at the defendant's apartment at which they drank and watched movies. However, the inferences drawn by the prosecutor from that evidence were neither reasonable nor pertinent to issues before the jury. The statement that young co-workers "would frequent his apartment on a regular basis to drink and do whatever" was based on Mr. Starnes's testimony that occasionally co-workers gathered at the defendant's place to drink and watch movies. Although these comments may have had some minimal relevance to proving the elements of premeditation and deliberation, those issues were no longer before the jury. Under count 1, the jury had to determine whether the defendant acted knowingly, recklessly, or with sufficient provocation to

64

justify a voluntary manslaughter conviction. In count 2, the jury had to decide whether the victim was killed during the perpetration of a rape or an attempted rape and the major issue was consent. The prosecutor's comments regarding the defendant's lifestyle were completely irrelevant to those issues. The trial court would have acted properly in sustaining objections to such comments.

## CONCLUSION

While this was a complex trial with several important issues, the primary consideration for the jury was whether the second sexual encounter was consensual. The state theorized that the defendant took advantage of the unconscious victim and, when discovered, killed to hide his crime. The level of intoxication of the victim was especially relevant to the question of consent. The medical testimony was especially important to the state. Portions of it should have been excluded.

The mens rea of the defendant as to his intent to rape is critical to the verdict. The entire theory of the state depends upon the interpretation of the unredacted statements made by the defendant to police. This is, did the totality of the evidence suggest a forceful rape of a younger victim helpless to resist? Or could this have been consensual sex between adults involving bondage that, due to the reckless acts of the defendant, resulted in the unintended death of the victim? In our view, the possibilities ranged from criminally negligent homicide to first degree murder. It was the duty of the jurors to assess the various alternatives.

There were, by our calculations, some eight relatively minor errors in the course of the trial. Two of the errors pertained to the recorded statement of the defendant, the single most important piece of evidence in the trial. The testimony of Detective Warf as to the demeanor of the defendant during his interview with police is

65

of concern but, as indicated, not enough, standing alone, to warrant reversal. The trial court allowed accusatory speculation by the detective. The audiotape of the statements allowed the jury to assess the defendant's voice or pauses in speech and then arrive at its own conclusions. The implications of the officers during the interview, while perfectly understandable, tainted somewhat the desired neutrality in the assessment of the facts. The lifestyle testimony, particularly as it related to drunkenness and homosexuality, invited speculation. During closing argument, the prosecution linked that lifestyle (entertaining young men, providing them with alcohol, and doing "whatever") to the defendant's intent to fulfill his "closet desires" and "closet homosexuality." In essence, the state asked the jury to conclude that this death had resulted from an intended rape because the defendant had a demonstrated a desire and propensity to generally engage in this type of risky conduct.

In our view, any one of these errors would not have warranted a new trial. Their cumulative effect, however, casts doubts upon the reliability of the verdict. See Taylor v. Kentucky, 436 U.S. 478 (1978); State v. Zimmerman, 823 S.W.2d 220 (Tenn. Crim. App. 1991). Despite the considerable evidence of guilt, the facts present a close question between first degree murder and a lesser degree of homicide. The trial court instruction to the jury implied that. Under these very unusual circumstances, a new trial is warranted. See State v. McCray, 922 S.W.2d 511 (Tenn. 1996).

We acknowledge that the issues in this case placed incredible demands upon the skills of the trial judge, who is among the very best in our profession. While it is difficult to assess the cumulative effect of several relatively minor errors, we are hesitant to classify them as collectively harmless. In our view, the crucial question for this jury to answer was the grade of homicide. While there is sufficient evidence to show a felony murder, there is also evidence of second degree murder, a criminally

66

negligent homicide, or perhaps, other grades of the offense.  See Gladson v. State, 577 S.W.2d 686, 687 (Tenn. Crim. App. 1978) (where irrelevant and prejudicial evidence erroneously admitted, the court could not conclude the evidence did not cause the jury "to reject the plea of self-defense or ... consider the offense of manslaughter").  A new trial can provide the best answer to the various possible alternatives.

Upon remand, the trial court must establish the status of count 1. According to our review, no verdict was entered on count 1 which the trial court reduced to a charge of second degree murder.  It appears that the charge in count 1 is still pending; the count should be concluded by appropriate order.  Our interpretation is that count 1 has, in effect, been mistried.

Accordingly, the judgment of the trial court is reversed and the cause is remanded for further proceedings as contemplated by this opinion.

_____
GARY R. WADE, JUDGE

CONCUR:


_____
DAVID H. WELLES, JUDGE


_____
CURWOOD WITT, JUDGE